# CHARLESTON.

## KOELZ *v.* BRINKMAN.

Submitted September 9, 1901.    Decided November 30, 1901.

1. Co-PARTNERSHIP—*Dissolution—Settlement.*

    In the settlement of the accounts of a solvent co-partnership, on dissolution, the commissioner, before undertaking to ascertain the net assets and profits and distribute the same, should find the true state of the accounts between the firm and each of its members, as separate and distinct settlements, after which sums due the firm from its individual members, however incurred, are to be treated as assets, and sums, due from the firm to its members, as liabilities.    (p. 272).

.2. PARTNERSHIP—*Accounts Settled—Net Assets.*

    In such case, having so settled the accounts between the firm and its members, the net assets should then be ascertained by deducting from the total assets the total liabilities; after which the total capital contributed by the members of the firm should be deducted, and the remainder divided as profits, according to the agreement of the parties.    (p. 296).

3. PARTNERS—*Stating Accounts—Debts.*

    In ascertaining the state of the accounts between the partners, where the firm is composed of but two members, and one has taken all the assets and assumed the payment of all the debts, each should be credited with what the firm owes him, if anything, with what he has assumed to pay for the firm, if anything, with his capital contributed and with his share of the profits, and then charged with what he owes the firm, if anything, and with whatever assets of the firm he has taken by the dissolution agreement, if any.    The balance then struck will show what is due to, and from, the co-partners, respectively.    (p. 297).

Appeal from Circuit Court, Taylor County.

Action by Ernest W. Koelz against George Brinkman. Decree for plaintiff, and defendant appeals.

*Reversed.*

WILLIAM R. D. DENT, JOHN HECHMER, and CAMPBELL, HOLT & CAMPBELL, for appellant.

DAVIS & DAVIS and B. F. BAILEY, for appellee.

POFFENBARGER, JUDGE:

Prior to May 1, 1874, George Brinkman had been engaged in the mercantile business in the town of Grafton in this State and E. W. Koelz had, for some years, been employed as clerk in his store. On said date, Brinkman and Koelz formed a co-partnership which, under the name of George Brinkman & Co., continued the business until March 1, 1894. At the time of the formation of this co-partnership the stock of goods owned by Brinkman invoiced five thousand five hundred and fifty-nine dollars and eighteen cents. At that time, Brinkman owed Koelz about nine hundred and fifty dollars on account of his wages, which, together with cash amounting to two hundred and sixty-seven dollars and ninety-nine cents, Koelz put into the business as his contribution to the capital of the firm. That is all Koelz ever advanced or put into the business. In addition to the stock of goods, Brinkman turned over to the firm as an advancement at the time of the formation of the co-partnership accounts due him amounting to about two thousand two hundred dollars which appear to have been collected and used by the firm. The building in which the business was carried on belonged to Brinkman and he charged the firm rent which, starting at three hundred dollars a year, was increased, from time to time, as the business grew and more room was needed until, at the time of the dissolution, it stood at seven hundred and twenty dollars. Brinkman also boarded two of the clerks for a considerable portion of the time at the rate of fifteen dollars each per month. He also had some of his sons working in the store as clerks and he, being entitled to their earnings, charged the firm with their wages. He seems to have had a great deal of individual business and property. Many of his collections due to him privately were deposited in the bank to the credit of the firm. Such deposits were also made of his rents for real estate owned by him, dividends on bank stock and various other accounts. These funds, while so deposited to the credit of the firm, were used in the co-partnership business. At the same time, Brinkman drew upon these funds for his individual purposes as he needed money. Counting the clerk hire and boarding of clerks and the rent of his building and money in various amounts from various sources which went into the hands of

the firm as advancements, he fixes the amount so advanced in a statement filed with his answer, at the sum of seventy-nine thousand nine hundred and sixty-two dollars and seventeen cents, and the amount withdrawn by him for various purposes including his account on the books of the firm at fifty-nine thousand seven hundred and three dollars and seventeen cents. Koelz received from the firm, in various ways during the existence of the co-partnership, thirteen thousand sixty-nine dollars and fifty cents. The firm was dissolved by mutual consent on the 1st day of March, 1894, Brinkman taking all the assets and assuming the payment of the bills, and, after several unsuccessful efforts to settle, Koelz, in the year of 1894, filed his bill in equity in the circuit court of Taylor County praying a settlement of the co-partnership business. Brinkman promptly appeared and filed his answer, admitting the co-partnership and dissolution thereof and that, by the contract which was verbal, they were to share equally in the profits and losses of the business, and likewise praying a settlement of the partnership business. The cause was referred to J. G. St. Clair, commissioner, to audit, state and settle the partnership accounts. The commissioner, after examining the books and taking the testimony of Brinkman, made up his report, based largely upon the receipts and expenditures of the firm during the existence of the co-partnership, and found that there was due the plaintiff on account of profit and stock the sum of two thousand nine hundred and eighty-seven dollars and forty-five cents. He found the total receipts to be seven hundred and sixteen thousand three hundred and seven dollars and fifty-five cents and the expenditures six hundred and seventy-two thousand two hundred and fifty-three dollars and struck a balance of forty-four thousand fifty-four dollars and fifty-five cents. He then found that Brinkman had put into the business in all the ways hereinbefore noted seventy-nine thousand nine hundred and sixty-two dollars and seventeen cents and had taken out fifty-nine thousand six hundred and ninety-four dollars and seventeen cents, leaving the firm indebted to him twenty thousand two hundred and sixty-eight dollars. This, he deducted from the balance struck by him of forty-four thousand fifty-four dollars and fifty-five cents, leaving twenty-three thousand seven hundred and eighty-six dollars and fifty-five cents to the credit of the firm.

From this he deducted the thirteen thousand sixty-eight dollars and eight cents which had been taken out of the firm by Koelz, leaving a balance in favor of the firm of ten thousand seven hundred and seventeen dollars and forty-five cents. The stock on hands at the time of the dissolution invoiced seven thousand three hundred and forty-eight dollars and fifty-two cents which was taken by Brinkman who continued the business after the retirement of Koelz, and this sum the commissioner deducted from said sum of ten thousand seven hundred and seventeen dollars and forty-seven cents, leaving three thousand three hundred and sixty-eight dollars and ninety-five cents to be divided into two equal parts, giving to Koelz one thousand six hundred and eighty-four dollars and forty-seven cents. To this he added one thousand two hundred and fourteen dollars and ninety-eight cents, the amount Koelz had originally put into the business and eighty dollars, one-half of the excess of stock, making two thousand nine hundred and ninety-seven dollars and forty-five cents as the amount of profits and stock due Koelz. He then found that, at the time of the dissolution, the firm had good accounts amounting to three thousand fifty dollars and ninety cents and owed two thousand five hundred and ninety-nine dollars and twenty cents. Finding the difference between these amounts to be four hundred and fifty-one dollars and seventy cents, he gave Koelz credit for one-half of that difference, two hundred and twenty-five dollars and eighty-five cents, which he added to the two thousand nine hundred and eighty-seven dollars and forty-one cents and reported that there was due to Koelz from Brinkham, three thousand two hundred and thirteen dollars and twenty-six cents upon a final settlement of the partnership business. He also found that the firm held worthless accounts amounting to five thousand five hundred and ten dollars and fifty-two cents at the time of the dissolution. Brinkman, in his deposition returned with said report, says said firm also had seven hundred and six dollars in cash at the time of the dissolution.

Brinkman filed several exceptions to the report and it was recommitted to the same commissioner, who, in December, 1895, made his second report, in which he shows that no new evidence had been taken and that he saw no reason for changing his original report, and at November rules, 1895, the

plaintiff filed an amended bill, a motion to dismiss which was overruled, and the cause was again referred to the same commissioner. The amended bill charges that Brinkman controlled the financial interests of the firm, had failed and refused to make any settlement with the plaintiff, had caused an inventory of the stock to be made and a notice of the dissolution to be published without the co-operation of the plaintiff therein, had withdrawn wrongfully and improperly seventy-five thousand dollars or one hundred thousand dollars of partnership funds in excess of his rightful share and appropriated them to his own use, had, without the knowledge of the plaintiff, withdrawn eighteen thousand dollars or twenty thousand dollars of partnership funds and invested it in real estate which had increased in value until worth forty thousand dollars, taking the conveyance in his own name, had kept the plaintiff in ignorance of his rights and of the financial condition of the firm, and had been guilty of other transactions which were in fraud of the plaintiff's rights. Other allegations of the bill denied some and admitted others of the facts hereinbefore set out. Brinkman filed an answer to the amended bill denying all fraudulent and improper conduct on his part and alleging his title to the credits and method of adjustment and settlement contended for by him.

In his third report, the commissioner found the same excess of receipts over disbursements, forty-four thousand fifty dollars and fifty-five cents. He found two errors in the account of seventeen thousand one hundred and forty dollars and eighty-eight cents against Brinkman on the books of the firm. One of these was one thousand one hundred and forty dollars and eighty-two cents and the other eight hundred and thirty-three dollars and ninety-six cents, thus reducing this account to fifteen thousand three hundred and ninety-six dollars and ninety-seven cents. He found the assets of the firm to be forty-four thousand three hundred and seventy-five dollars and nine cents, composed of the account against Brinkman, fifteen thousand three hundred and ninety-six dollars and ninety-seven cents, the account against Koelz thirteen thousand sixty-nine dollars and eight cents, the stock they owned seven thousand three hundred and forty-eight dollars and fifty-two cents, the good accounts three thousand and fifty dollars and the uncollectable accounts five thousand five hundred and

ten dollars and fifty-two cents. He found the liabilities of the firm to be nine thousand eight hundred and three dollars composed of its indebtedness two thousand five hundred and ninety-nine dollars and twenty cents, Koelz's original contribution one thousand two hundred and forty-four dollars and ninety-four cents and Brinkman's original contribution five thousand nine hundred and fifty-nine dollars and eighteen cents. Then combining the original stock seven thousand two hundred and four dollars and twelve cents, the uncollectable accounts five thousand five hundred and ten dollars and fifty-two cents and the firm's indebtedness two thousand five hundred and ninety-nine dollars and twenty cents, he had a total indebtedness of fifteen thousand three hundred and thirteen dollars and eighty-four cents which he deducted from what he calls the assets forty-four thousand three hundred and seventy-five dollars and nine cents, leaving a remainder of twenty-nine thousand sixty-one dollars and twenty-five cents, which he divided as profits, assigning to Koelz and Brinkman each fourteen thousand five hundred and thirty dollars and sixty-two cents on that account. Adding to this Koelz's original contribution of one thousand two hundred and forty-four dollars and ninety-four cents, the amount to which he was entitled was found to be fifteen thousand seven hundred and seventy-five dollars and fifty-six cents less the thirteen thousand sixty-nine dollars and eight cents he had received making the amount due him from Brinkman two thousand seven hundred and six dollars and forty-nine cents. Adding to the fourteen thousand five hundred and thirty dollars and sixty-two cents Brinkman's original contribution of five thousand nine hundred and fifty-nine dollars and eighteen cents making twenty thousand four hundred and eighty-nine dollars and eighty cents, he deducted this sum from twenty-three thousand one hundred and ninety-six dollars and twenty-nine cents, the total amount received by Brinkman from the firm after deducting from it the firm's indebtedness which he had assumed. In this way, he found the same result, two thousand seven hundred and six dollars and forty-nine cents.

He also reports the following facts found by him: Receipts of the firm as shown by the books, seven hundred and nineteen thousand one hundred and twenty-two dollars and thirty-one cents; disbursements shown by the same books, three hundred

and nine thousand sixty-nine dollars and seventy-seven cents; In books "1X and 2X," none of the disbursements made on account of the business through the bank are entered; in books "3X, 4X and 5X" the disbursements made at the store and at the bank are entered; the amounts found in books "3X, 4X and 5X" to have been paid through the bank aggregate one hundred and eighty-nine thousand three hundred and thirteen dollars and ten cents; cash paid out over the counter at the store one hundred and nineteen thousand seven hundred and fifty-six dollars and sixty-seven cents, found by deducting the one hundred and eighty-nine thousand three hundred and thirteen dollars and ten cents from the three hundred and nine thousand sixty-nine dollars and seventy-seven cents, the entire amount of cash shown by the books to have been disbursed; cash that should have gone to the bank from the store five hundred and ninety-nine thousand three hundred and sixty-five dollars and sixty-four cents, found by deducting the one hundred and nineteen thousand seven hundred and fifty-six dollars and sixty-seven cents from the total amount of cash shown by the books to have been received at the store; total amount of deposits in the bank shown by the bank books six hundred and fifty-seven thousand five hundred and thirty dollars and eighty-two cents, being fifty-eight thousand one hundred and sixty-five dollars and eighteen cents more than was or should have been deposited from the store; total receipts of the firm over all sources seven hundred and seventy-seven thousand two hundred and eighty-seven dollars and forty-nine cents; total disbursements at bank and store seven hundred and seventy-six thousand seven hundred and forty-one dollars and fifty-nine cents; balance in cash as of the date of dissolution five hundred and forty-five dollars and ninety cents; cash balance shown by tabulation of bank books made by commissioner five hundred and forty-five dollars and ninety cents; withdrawn by Brinkman in groceries, money, etc., fifty-nine thousand six hundred and ninety-four dollars and seventeen cents; paid for Brinkman taxes two thousand two hundred and eighty-two dollars and forty-eight cents and an item designated "Masonic Matter" one thousand nine hundred and thirty-seven dollars not charged in his account; amount advanced by Brinkman in addition to the original capital put in

by him seventy-four thousand two dollars and ninety-nine cents; amount included in said seventy-four thousand two dollars and ninety-nine cents for clerk hire and board of clerks sixteen thousand four hundred and fifteen dollars, store room rent eleven thousand six hundred and eleven dollars and fifty-five cents, proceeds of sales of real estate three thousand six hundred dollars, bank stock dividends and salaries as director two thousand two hundred and fifty-two' dollars, miscellaneous items which Brinkman says are not included in cash receipts one thousand six hundred and thirty-four dollars and forty-one cents, making a total of thirty-five thousand five hundred and twelve dollars and ninety-six cents.

Having made these findings, the commissioner made a second statement, based upon the total firm assets forty-four thousand three hundred and seventy-five dollars and nine cents, upon the assumption that the thirteen thousand sixty-nine dollars and eight cents charged to Koelz on the books should not be deducted from the finding in the first statement. In this way he shows Koelz to be entitled to fifteen thousand seven hundred and seventy-five dollars and fifty-six cents. He makes a third statement which, if correct, would make a balance due Koelz from Brinkman of twenty-eight thousand three hundred and eighteen dollars and twenty-seven and one-half cents. This he accomplished by adding cash receipts as per exhibit "Z." Seven hundred and sixteen thousand three hundred and seven dollars and fifty cents, advancements of Brinkman not included in cash receipts thirty-six thousand five hundred and twelve dollars and ninety-six cents, stock of goods seven thousand three hundred and forty-eight dollars and fifty-two cents, cash in hand seven hundred and six dollars, bills receivable from Brinkman's account one thousand five hundred and thirty-nine dollars and thirty-three cents, Brinkman's account due the firm sixty-one thousand nine hundred and eighteen dollars and eighty-seven cents and Koelz's account thirteen thousand sixty-nine dollars and fifty cents, making eight hundred and thirty-six thousand four hundred and two dollars and sixty-eight cents called total assets; and deducting from that seven hundred and fifty-six thousand fifty-seven dollars and one cent, the total liabilities composed of the following items: expense account as per books six hundred and seventy-two thousand two hundred and fifty-

two dollars and seventy cents, bills payable two thousand five hundred and ninety-nine dollars and twenty cents, Brinkman's advancement seventy-four thousand two dollars and ninety-nine cents and capital stock seven thousand two hundred and two dollars and ninety-nine cents. This left a balance of eighty thousand three hundred and forty-five dollars and sixty-seven cents, which the commissioner divides and from the one-half deducts Koelz's account and to the remainder adds Koelz's original contribution to the capital one thousand two hundred and fourteen dollars and ninety-four cents, thus making the amount due him twenty-eight thousand three hundred and eighteen dollars and twenty-seven cents. He makes a fourth statement on the same basis and arrives at the same result. He makes a fifth statement, taking as a basis the balance due Brinkman assuming that he has advanced the firm seventy-four thousand two dollars and ninety-nine cents in addition to his original contribution and had withdrawn sixty-one thousand nine hundred and eighteen dollars and eighty-seven cents and, therefore, is the creditor of the firm to the extent of twelve thousand and eighty-four dollars and twelve cents. Then assuming that Brinkman has withdrawn from the firm the thirty-five thousand five hundred and twelve dollars and ninety-six cents for store rent, clerk hire, bank stock dividens, etc., and should pay the firm one-half of said amount seventeen thousand seven hundred and fifty-six dollars and forty-eight cents, he deducts from that Koelz's account which leaves a remainder of four thousand six hundred and eighty-six dollars and ninety-eight cents which he says Brinkman would owe the firm in excess of what is due it from Koelz. Then finding the firm has on hands in cash and its original investment of capital six thousand seven hundred and forty-four dollars and fifteen cents in excess of the outstanding debts, he gives one-half of that, three thousand three hundred and seventy-two dollars and seven cents, to Koelz. Adding to this last amount Koelz's original contribution one thousand two hundred and fourteen dollars and ninety-nine cents and the one-half of the seventy-four thousand six hundred and eighty-six dollars and ninety-eight cents, due from Brinkman in excess of what Koelz owes, two thousand three hundred and forty-three dollars and forty-nine cents, he makes the amount

due Koelz six thousand nine hundred and thirty dollars and fifty cents.

The commissioner appends to his report, tables A, B, C, D, E and F, covering more than thirty pages of the record, and another paper called exhibit Z, covering about eighty-six pages of the record. Table A gives the receipts, at the store taken from the books, table B the disbursements found from the bank books and the store books 3X, 4X and 5X. Table C is a tabulation made from the bank books. Table D shows the disbursements as taken from all the firm books, and table E the disbursements taken from the bank books not included in the firm books kept at the store. Table F is a statement summarizing the receipts as taken from the books at the store. Exhibit Z is a compilation of matter taken from the books of the firm in which the account between Brinkman and the firm is itemized and also between Koelz and the firm and the cash and expense account are set out and the receipts and disbursements given. The depositions of both Koelz and Brinkman, as well as those of other witnesses, were taken and all were returned with the report. During the execution of the order of reference the plaintiff propounded a number of interrogatories to the defendant and these with the answers thereto and exceptions of the plaintiff to the answers were also returned with the report.

At the instance of the plaintiff, Dr. E. M. Turner made a special report which was filed with Commissioner St. Clair, but the latter did not approve said report, although it was returned with his report. To the report of Commissioner St. Clair, both plaintiff and defendant excepted, "but the court, without passing upon said reports and the various exceptions thereto, being of opinion that there should be a full and definite settlement of the individual account of George Brinkman with the firm of Brinkman & Co., before the court passes upon the various matters of said reports and special report filed as aforesaid," referred the cause to Special Commissioner J. N. McMullen to settle and adjust the individual account of Brinkman with the firm and the account of Koelz with the firm. Commissioner McMullen found that there was due Koelz from Brinkman the sum of eighteen thousand two hundred and twenty-three dollars and eighteen cents. In this report the total receipts, including the money paid out at the store and into the banks to the credit

of the firm by Brinkman, his rents, dividends, salary as bank director and other funds, were ascertained to be seven hundred and thirty-two thousand two hundred and seventy-six dollars and fifty-seven cents. The amount of actual money thus turned in by Brinkman was fixed at forty-four thousand eight hundred and seven dollars and ninety-five cents, leaving for clerk hire, rents of store building, board of clerks and other charges of Brinkman against the firm, which were not cash payments by him at twenty-nine thousand one hundred and ninety-five dollars. The total of disbursements was found to amount to six hundred and seventy-two thousand two hundred and fifty-three dollars. The amount ascertained to have been withdrawn by Brinkman from the firm, including his store account and cash withdrawals, was found to be fifty-nine thousand six hundred and ninety-four dollars and seventeen cents. The other items, entering into the statement and calculation by which the commissioner reached his conclusion, were the same as found by commissioner St. Clair. Said statement and calculation are as follows:

### STATEMENT NO. 6.

Showing amount of assets of the firm of Geo. Brinkman & Co. at the time of dissolution of the firm March 1, 1894, not including solvent accounts due the firm:

| | |
|---|---|
| By total amount cash receipts, Statement No. 1...$732,276.57 | |
| By amount of Geo. Brinkman's store account and cash withdrawals as per account filed with his answer to original bill...................... | 59,694.17 |
| By amount added on account of taxes............ | 2,282.48 |
| By amount added on account Masonic Matters.... | 1,937.00 |
| By amount to E. W. Koelz's account............. | 13,069.50 |
| By amount of invoice stock of goods............. | 7,348.52 |
| By amount bills receivable.................... | 1,539.33 |

### .(Contra)

| | |
|---|---|
| To amount of erroneous charge in the acct. against Brinkman, check 114 ...... .................. | $1,140.82 |
| To am't due Brinkman survivor of Brinkman and Nuzum .......... | 853.96 |
| To am't of cash advancements made by Brinkman, Statement No 1... | 44,807.99 |

To am't due Brinkman for clerk hire,
  store rent, etc., $74,002.99, less
  $44,807.99 ...... ............    29,195.00
To am't of expenditures, cash, see
  Statement No. 1 ...............   672,253.00
To am't bills payable.............    2,599.20
To am't over liabilities, including
  the input capital ................  67,297.60
                                     _____  _____
                                     $818,147.57   $818,147.57

STATEMENT NO. 5.

Showing a settlement of the account of Geo. Brinkman with the other partner of the firm of Brinkman & Co., making a distribution of the input capital and the profits of the business of Brinkman & Co., said Geo. Brinkman having retained all the assets of said firm and assumed its liabilities:

By am't assets, including Koelz's account and input
  capital ............... .....................$67,297.60
To am't of his input capital.......... $5,957.18
To am't of his share of the profits.... 30,047.74
To am't of Koelz's acct. deducted..... 13,069.50
To am't in the hands of Geo. Brinkman
  belonging to E. W. Koelz.......... 18,223.18
                                     _____  _____
                                     $67,297.60    $67,297.60

STATEMENT NO. 6.

Showing a settlement of the account of E. W. Koelz with the other partner of the firm of Brinkman & Co., making a distribution of the input capital and the profits of the business of Brinkman & Co., E. W. Koelz having allowed Geo. Brinkman to pay out most of the receipts of the firm and to retain all its assets at time of dissolution:

By am't of his share of profits.............. ..... $30,047.74
By am't of his input capital....................   1,244.94
By am't of his acct.................$13,069.50
By am't due him to balance......... 18,223.18
                                     _____  _____
                                     $31,292.68    $31,292.68"

It will be noticed that the principal difference between the re-

port of McMullen and that of St. Clair is in the total amounts of cash receipts and disbursements given by them. St. Clair found the total cash receipts, at the store to be seven hundred and nineteen thousand one hundred and twenty-two dollars and thirty-one cents, and the total cash receipts of the firm from all sources seven hundred and seventy-seven thousand two hundred and eighty-seven dollars and forty-nine cents, the difference, fifty-eight thousand one hundred and sixty-five dollars and eighteen cents, having been deposited in the banks in the name of the firm but not entered on the books of the firm. McMullen finds the total cash receipts to be seven hundred and thirty-two thousand two hundred and seventy-six dollars and fifty-seven cents. This amount is considerably in excess of the cash receipts at the store as found by St. Clair, and about forty-five thousand dollars less than the receipts from all sources as found by St. Clair. St. Clair ascertained the receipts at the store from the books and set them out in table A by monthly and annual periods during the existence of the co-partnership. Finding that the bank books showed deposits in excess of the amount thus found, he added the excess and thus arrived at the total receipts. McMullen, in ascertaining the total receipts, divided the co-partnership into two periods, the first, beginning May 1, 1874, and ending April 30, 1887, and the other, beginning May 1, 1887, and ending with the dissolution March 1, 1894. The reason for this is that during the first period Koelz had charge of the books and during the latter period Brinkman kept the books, although the evidence shows that both of them had access to the books at all times. Koelz, however, did the principal part of the bookkeeping during the first period and Brinkman during the latter. For the first period McMullen prepared a statement showing the monthly and annual receipts. It contains two columns, one of which is headed "Cash paid at store," and the other "Cash deposited" and he says it is made up by comparison of the books kept at the store and the bank books covering said first period. He thus finds the amount deposited was four hundred and five thousand seven hundred and fifty-five dollars and fourteen cents and the amount paid out at the store eighty-one thousand five hundred and fifty-one dollars and thirty-seven cents making a total of four hundred and eighty-seven thousand three hundred and six dollars and fifty-one cents for said first period, which he calls total cash receipts

to May 1, 1887. For the second period he uses the figures and the same amounts that were used by St. Clair, except that he makes no allowance for money paid out at the store, and finds the total receipts for that period to be two hundred and forty-four thousand nine hundred and seventy dollars and six cents.

There is a vast difference also between the disbursements as found by the commissioners. McMullen finds that during said first period eighty-one thousand five hundred and fifty-one dollars and thirty-seven cents was paid out at the store but he makes no statement as to how much was thus paid out during the second period. He obtained that fact for the first period to enable him to determine the whole amount of cash received during that period, and for no other purpose, for he made no other use of it. In ascertaining the whole amount disbursed he ignored the division into periods. The reason assigned seems to be this, taken from his report: "Having determined the amount of cash receipts the commissioner has held George Brinkman responsible for same, as it appears from the evidence that all the checks, etc., were under his control and most of them were issued by him and there being no dispute as to the amount paid over the counter prior to May 1, 1887, the commissioner having determined that George Brinkman should account for the cash receipts other than cash paid over the counter, it then became necessary to ascertain what became of said seven hundred and thirty-two thousand two hundred and seventy-six dollars and fifty-seven cents." He then takes the total expenditures or disbursements as given in exhibit Z prepared by Brinkman and filed with St. Clair's report, six hundred and seventy-two thousand two hundred and fifty-three dollars, from his total receipts, thus finding a balance of sixty thousand twenty-three dollars and fifty-seven cents, which he calls receipts in the hands of George Brinkman, including sums of money which he put into the business out of his own funds. The part of exhibit Z from which this total of disbursements was taken is headed "Recapitulation of general business" and gives the annual receipts and expenses making the total receipts seven hundred and sixteen thousand three hundred and seven dollars and fifty-five cents and total expenses six hundred and seventy-two thousand two hundred and fifty-three dollars and making the balance forty-four thousand fifty-four dollars and fifty-five cents. St. Clair found the total disbursements to be seven hundred and

seventy-six thousand seven hundred and forty-one dollars and fifty-nine cents. He found this by ascertaining that during the whole period six hundred and fifty-six thousand nine hundred and eighty-four dollars and ninety-two cents had been disbursed through the bank and one hundred and nineteen thousand seven hundred and fifty-six dollars and sixty-seven cents paid out at the store over the counter. He says none of the disbursements made through the bank are found in books 1X and 2X but the other three books contain the disbursements in both ways. He says the disbursements shown by the books amount to three hundred and nine thousand sixty-nine dollars and seventy-seven cents. The amounts paid through the bank and entered in the last three books aggregate one hundred and eighty-nine thousand three hundred and thirteen dollars and ten cents. Deducting that amount from the total disbursements shown by the books there remains one hundred and nineteen thousand seven hundred and fifty-six dollars and sixty-seven cents for the amount paid out over the counter at the store. Both parties filed numerous exceptions to the report of Commissioner McMullen.

In order that the differences of opinion as to the state of this account and the confusion in which the matters in controversy are involved may more clearly appear, it is well to compare with the reports of St. Clair and McMullen the special report made by Dr. E. M. Turner at the instance of the plaintiff. The cash receipts at the store are placed by him at seven hundred and nineteen thousand one hundred and fifty-six dollars and seventy cents, practically the same as the amount ascertained by St. Clair, the difference being only about thirty-four dollars. To that he adds the ammount received on account of Brinkman's bank dividends, salary as bank director, cash from rents, sales of real estate, the store room rent, clerk hire and board of clerks and numerous other smaller items which he thinks ought to be, or may be, chargeable to the cash receipts, and thus makes out a total of cash receipts on all accounts amounting to seven hundred and sixty-five thousand six hundred and ten dollars and twenty-three cents. Then he makes another summary upon the assumption that one thousand eight hundred and seventeen dollars and eighty-six cents of the former items were not to have been charged to cash receipts and thus makes the total seven hundred and sixty-three thousand seven hundred and ninety-two dollars and thirty-seven cents. In still another summary based

upon another assumption he makes the cash receipts seven hundred and fifty-six thousand two hundred and twenty-seven dollars. He makes the total expenditures six hundred and seventy-two thousand two hundred and fifty-two dollars and seventy cents. He then states the accounts between the parties in ten different ways, upon as many different assumptions as to the total cash receipts and some other items of the account, the last one of which is most favorable to Brinkman, and in that he finds that there is due from him to Koelz twenty-eight thousand three hundred and forty-eight dollars and twenty-seven and one-half cents. In all of these statements, the total of liabilities of the firm is made seven hundred and fifty-six thousand two hundred and forty-two dollars and one cent, composed of the following items: Expense account six hundred and seventy-two thousand two hundred and fifty-two dollars and seventy cents, bills payable two thousand five hundred and ninety-nine dollars and twenty cents, Brinkman's advancement seventy-four thousand one hundred and eighty-seven dollars and ninety-nine cents, and capital stock seven thousand two hundred and two dollars and twelve cents. All the changes made in the various statements, producing the different results, are in the other side of the account. The amounts reported as due from Brinkman upon these several statements based upon different hypotheses are, first thirty-five thousand five hundred and thirty-eight dollars and seventy-six cents; second, thirty-four thousand seven hundred and sixty dollars; third, thirty-five thousand one hundred and fifty dollars and sixty-six cents; fourth, thirty-four thousand three hundred and seventy-one dollars and ninety-nine cents; fifth, thirty-three thousand five hundred and fifty-five dollars and fifty-six cents; sixth, twenty-nine thousand seven hundred and seventy-two dollars and eighty-seven and one-half cents; seventh, thirty-three thousand two hundred and eighty-five dollars and forty-nine cents; eighth, thirty-two thousand eight hundred and ninety-seven dollars and thirty-nine cents; ninth, thirty-two thousand one hundred and thirty dollars and ninety-six cents; tenth, twenty-eight thousand three hundred and forty-eight dollars and twenty-seven and one-half cents. Commissioner St. Clair, as already stated, disapproved the special report made by Dr. Turner.

The cause came on to be heard upon all these reports and the exceptions thereto on the 23rd day of May, 1899, and, being

argued, was submitted on the 3rd day of February, 1900. The court made and entered a decree, overruling all the exceptions to the report of Commissioner McMullen, confirming said report, rejecting all the other reports, so far as they are in conflict with that of Commissioner McMullen, and requiring Brinkman to pay to said Koelz said sum of eighteen thousand two hundred and twenty-three dollars and eighteen cents, and that the costs of the suit be paid out of the assets of the late firm of Geo. Brinkman & Co. but the recovery of costs by the plaintiff was limited to one-half thereof. Brinkman has appealed from said decree.

The plaintiff proceeds upon the theory that large profits were made by the firm and that Brinkman appropriated to himself practically all these profits. The contention of the defendant is that the business has not been profitable and that while he has considerable property, much of which was undoubtedly acquired during the existence of the co-partnership, the business of the firm was not profitable and his individual accumulations have arisen from his trade and business transactions on his individual account and outside of the firm, although his individual funds have gone into the firm in large amounts. That considerable amounts of Brinkman's money were used in the firm business admits of no doubt. It is equally true that as he needed money for his individual purposes and investments he drew upon the firm account. Commissioner McMullen finds his advancements in cash to have been forty-four thousand eight hundred and seven dollars and ninety-nine cents and that the residue of his claim against the firm was for clerk hire and board and store room rent, etc., and amounts to twenty-nine thousand one hundred and ninety-five dollars. He finds that Brinkman had received from the firm fifty-nine thousand six hundred and ninety-four dollars and seventeen cents, including his store rent. In the special report of Dr. Turner, Brinkman's advancements are fixed at seventy-four thousand one hundred and eighty-seven dollars and ninety-nine cents and the account of firm against him at sixty-two thousand six hundred and ninety-five dollars and seven cents. Brinkman admits in his testimony that out of the firm funds taxes, due from him amounting to two thousand two hundred and eighty-two dollars and forty-eight cents and another claim, called the Masonic matter of one thousand nine hundred and thirty-seven dollars which are not charged in

his account, ought to be charged to him. There are two erroneous charges in the Brinkman account, amounting to one thousand nine hundred and ninety-four dollars and seventy-eight cents. There seems to be no doubt about these errors. Making these corrections and then adding some other smaller omitted items chargeable to Brinkman and found in exhibit Z, the special report fixes the amount of the account against him at sixty-two thousand six hundred and ninety-five dollars and seven cents. Commissioner St. Clair finds the amount of Brinkman's withdrawals, including his store account to be sixty-one thousand nine hundred and eighteen dollars and eighty-seven cents. He agrees with Dr. Turner in making the corrections as to the taxes and Masonic matter and the erroneous charges against Brinkman in the account, but he does not correct it as to the several smaller items, amounting in the aggregate to seven hundred and seventy-six dollars and twenty-six cents. As to this Brinkman account on both sides, the special report seems to have been more carefully prepared than either of the others, and is probably correct. There seems to be no doubt that that portion of Brinkman's account which is for rent of the store room and clerk hire and the board of clerks was never paid. Koelz says Brinkman took credit for these items on his account. There is no evidence of any payment of it. The store room rent is found to be eleven thousand six hundred and eleven dollars and fifty-five cents and the clerk hire and board sixteen thousand four hundred and fifteen dollars, and then there is another account for one thousand six hundred and thirty-four dollars and forty-one cents which seems not to have been paid, making the total of such claims twenty-nine thousand six hundred and sixty dollars and ninety-five cents. Assuming that Brinkman's account with the firm is correctly stated in the special report the firm would owe him eleven thousand four hundred and ninety-two dollars and ninety-two cents. As to the account between Koelz and the firm there is no dispute. He owes the firm thirteen thousand sixty-nine dollars and fifty cents.

Assuming that Commissioner St. Clair's statement of the receipts and expenditures is correct, it appears that the annual receipts, including the private funds of Brinkman handled by the firm were close to thirty-eight thousand eight hundred and sixty-four dollars. As Brinkman had about forty-four thousand eight hundred dollars of his individual money in the total re-

ceipts as found by Commissioner McMullen, the average annual receipts on account of the firm's business would be about thirty-six thousand six hundred and twenty-four dollars and the total receipts on account of the firm business proper was approximately seven hundred and thirty-two thousand four hundred and eighty-seven dollars and forty-nine cents which differs but slightly from the amount found by Commissioner McMullen as tne total receipts. What profit ought to be derived from a business of that magnitude, depends largely upon the manner in which it is conducted. This firm seems to have had rather heavy expenses. The total charge for rent was eleven thousand six hundred and eleven dollars and fifty-five cents. During the first five years they seem to have had two clerks employed. Their wages were probably five thousand dollars or six thousand dollars. Then come the wages of Charles C. Brinkman, Henry Brinkman and William F. Brinkman and Lizzie Vance, clerks, amounting to fourteen thousand nine hundred and ninety dollars. All this besides numerous other expenses had to be paid before there could be any profit. Then the firm had on hands at the date of dissolution insolvent accounts amounting to five thousand five hundred and ten dollars and fifty-two cents. Then in addition to that the board of the two clerks, Hess and Holly, from 1874 to 1879 amounting to one thousand four hundred and twenty-five dollars is credited to Brinkman against the firm. Thus on account of rent, clerk hire and board alone the expenses of the firm for the twenty years amounted to thirty-three thousand dollars, an average of about one thousand six hundred and fifty dollars on an annual business of about thirty-six thousand dollars. Then of course there were numerous other expenses so that it was largely probable that there was a large profit in the business. Of course this is only a general view of the matter as to the probability of the profits made, and is not binding upon any conclusion as to the form and substance of the settlement.

The decree is based, as has been shown, upon the report of Commissioner McMullen. In the statement found in that report, in which the amount decreed against Brinkman in favor of Koelz is fixed at eighteen thousand two hundred and twenty-three dollars and eighteen cents, the cash receipts are stated to be seven hundred and thirty-two thousand two hundred and seventy-six dollars and fifty-seven cents, and the disbursements of cash at six hundred and seventy-two thousand two hundred and

fifty-three dollars. In striking the balance, to ascertain the assets, it is proper to place the cash receipts on the side of assets and the disbursements of cash in the column of liabilities, but that is only for the purpose of determining the state of the cash of the firm—whether there is a surplus on hand or a deficit. It would be just as easy and just as correct, to leave these two items out of the statement and simply use in the column of assets the excess of receipts over disbursements, or, in the other, the excess of disbursements over receipts, as may be the case. The result would be exactly the same. The commissioner, by stating the account as he did, found that the receipts exceeded the expenditures by sixty thousand twenty-three dollars and twenty-seven cents. If this were correct, and the firm's assets amount to sixty thousand twenty-three dollars and twenty-seven cents, in addition to the stock of goods on hand and the solvent accounts, the assets would be seventy thousand four hundred and twenty-two dollars and nine cents, subject to the payment of its outstanding bills, amounting to two thousand five hundred and ninety-nine dollars and twenty cents, and a settlement of the accounts of the members of the firm. The commissioner finds the net assets including Koelz's account to be sixty-seven thousand two hundred and ninety-seven dollars and sixty cents, and it is clear that the greater portion of this amount results from finding the difference between the cash receipts and cash disbursements as fixed by him. It is very evident that the total of disbursements as found in his statement is incorrect. The firm bank accounts show disbursements, amounting to six hundred and fifty-six thousand nine hundred and eighty-four dollars and ninety-two cents. This is only fifteen thousand two hundred and sixty-eight dollars and eight cents less than the amount fixed by the commissioner as the total disbursements. The commissioner finds and reports that there was paid out over the counter, and not deposited in the bank, eighty-one thousand five hundred and fifty-one dollars and thirty-seven cents, during the first thirteen years of the existence of the copartnership. That must undoubtedly be added to the disbursements shown by the bank books, swelling the amount of disbursements to seven hundred and thirty-eight thousand five hundred and thirty-six dollars and twenty-nine cents. During that first thirteen years, the practice was to pay out money at the store, making part of the disbursements at the store and part of

them through the bank. Both McMullen and St. Clair reported that fact, and the books show it. Now there is nothing in the evidence to show that that practice did not continue during the remaining seven years of the co-partnership. It is fair to presume that it did continue and that a large amount of money, thirty thousand dollars or forty thousand dollars was thus paid out over the counter after May 1, 1887. Over eighty-one thousand dollars having been so paid in thirteen years it is quite probable that forty thousand dollars would be paid out during the next seven years. Commissioner St. Clair estimates the whole amount thus paid out at one hundred and nineteen thousand seven hundred and fifty-six dollars and eighty-two cents, and it is not likely that the money paid out in the store had been withdrawn, in any considerable amounts, from the bank. The bank books do not show any such practice. Adding to the deposits in the bank, the money paid over the counter, as found by Commissioner McMullen for the first thirteen years, the result is seven hundred and thirty-nine thousand eighty-two dollars and nineteen cents. Assuming that the practice of paying out money at the store was continued during the remainder of the co-partnership existence and that, say, forty thousand dollars was thus paid out during that time, the cash receipts would amount to about seven hundred and seventy-nine thousand dollars. The disbursements are practically the same, counting the money paid out at the store.

The bank books show a balance to the credit of the firm on March 1, 1894, of five hundred and forty-five dollars and ninety cents, but Brinkman in his answer admits that the cash on hand at that time was seven hundred and six dollars. The latter sum should be regarded as the cash assets of the firm, unless it is shown that there is other cash belonging to the firm in the hands of somebody. The invoice, showing a stock of goods of the value of seven thousand three hundred and forty-eight dollars and fifty-two cents, has not been impeached. All the commissioners adopt it as correct. The solvent accounts due the firm are found to be three thousand and fifty dollars. The outstanding debts of the firm, due to persons other than members, are ascertained to amount to two thousand five hundred and ninety-nine dollars and twenty cents. Koelz has withdrawn from the firm thirteen thousand sixty-nine dollars and fifty cents. Probably the best and most carefully prepared statement of the account of Brink-

man with the firm, shows that he has withdrawn sixty-two thousand six hundred and ninety-five dollars and seven cents, and that his advancements including the cash advanced and the credits he has taken, amount to seventy-four thousand one hundred and eighty-seven dollars and ninety-nine cents, leaving a balance in his favor and against the firm of eleven thousand four hundred and ninety-two dollars and ninety-two cents. The amount of capital contributed by Brinkman was five thousand nine hundred and fifty-seven dollars and eighteen cents and the amount contributed by Koelz was one thousand two hundred and forty-four dollars and ninety-four cents. Now the only question seems to be whether Brinkman has received money which has not been charged to him and whether the firm owes him that sum of eleven thousand four hundred and ninety-two dollars and ninety-two cents, or whether he has received that and more too. This record contains no evidence tending to show that he has received any more than said sum of sixty-two thousand six hundred and ninety-five dollars and seven cents, nor does it seem to be questioned by any of the commissioners that he is entitled to credit for less than seventy-four thousand two dollars and ninety-nine cents. In the special report, he is credited with seventy-four thousand one hundred and eighty-seven dollars and ninety-nine cents but that report, in charging him with sixty-two thousand six hundred and ninety-five dollars and seven cents, makes the debtor side of his account more than seven hundred dollars greater than do the reports of the other two commissioners and there seems to be some evidence to warrant the increase.

Now Commissioner McMullen says Brinkman should be charged with a vastly larger and indefinite sum, based upon estimated receipts and disbursements, simply because he controlled and managed the bank account, without any evidence before him that that account was improperly handled. What money was paid out at the store was paid out in the presence of Koelz. Part of it was paid out by Koelz. During the first thirteen years, Koelz did the principal part of the bookkeeping. After May 1, 1887, Brinkman did the principal part of the bookkeeping. The money paid out at the store each day was represented by slips deposited in the drawer, from these slips, the entries were made on the books at the close of the day's business. It is undisputed that Koelz had access to the books all the time.

All the books as well as these slips and the bank books and the checks and drafts paid in bank, appear to have been preserved. The books at the store and the bank books show that all the money that ever came into the firm's hands except a small amount, less than one thousand dollars, has been disbursed. Koelz's familiarity with the books and the business ought to enable him, with the aid of his counsel, to show substantially the amount of disbursements made on account of firm liabilities and those made on account of individual liabilities of Brinkman. If the receipts were shown to be in excess of the disbursements, and there was nothing to indicate where the money is or where it went, then Commissioner McMullen's theory of holding Brinkman responsible for the funds of the firm not accounted for might be justly applied, but such is not the condition. The funds have all gone out practically and the record shows to whom and for what they have been paid. In order to charge Brinkman it becomes necessary to show that in point of fact he received part of the money which is represented to have gone to other persons. If Brinkman drew any checks payable to himself that could be easily shown. If any drafts were paid at the bank in satisfaction of individual obligations to Brinkman no reason is assigned why that could not be shown. If Brinkman entered upon the books or put into the drawer slips, showing large payments or numerous small payments of cash on store account, when, in fact, such payments had not been made, and the money had been abstracted by him and appropriated to his own use, it seems that Koelz should have detected it, being in the store all the time, and having access to the books and the money drawer. But no such accusation is made by him. He only claims that because Brinkman had control of the financial part of the business, as he puts it, he, Koelz, knows nothing about it and Brinkman ought to be held responsible to him on general principles and the supposition of large profits, because Brinkman has made money, while Koelz has not. And this view seems to have been taken by Commissioner McMullen and Dr. Turner.

Defendant's exceptions to the report of Cimmissioner McMullen, from one to fourteen, inclusive, relate to matters which cannot be determined from the record as it is found here. They are exceptions to the findings of the commissioner as to monthly and annual receipts and disbursements, which can only be found

from the books of the firm, and they have been omitted from the record at the instance of Brinkman. But as will appear later, the exceptions should have been sustained.

The fifteenth exception is to the finding of the commissioner that the total disbursements or expenditures of the firm amount to six hundred and seventy-two thousand two hundred and fifty-three dollars. Enough has been said to show that this exception should have been sustained. The finding is clearly wrong, and is prejudicial, for it forms in part the basis of the erroneous report of eighteen thousand two hundred and twenty-three dollars and eighteen cents of indebtedness from Brinkman to Koelz. The expenditures were clearly many thousands of dollars larger.

The sixteenth exception is to the finding that the expenditures amount to only six hundred and seventy-two thousand two hundred and fifty-three dollars, for the reason that the fifty-nine thousand six hundred and ninety-four dollars and seventeen cents, the sum of the payments made to Brinkman are not included. So much of that sum as represents cash should have been included, for against all the cash taken in by the firm there must be placed all the cash paid out to ascertain what amount the firm has, or ought to have, on hands as assets. In the same exception numerous other objections are made. One is to the ascertainment of the receipts from the books and ignoring part of the books in ascertaining the disbursements. This refers to the failure to take any account of the cash paid out at the store, during the last seven years of the co-partnership. That was clearly wrong as has been shown. Others are to the action of the commissioner in holding Brinkman responsible for the total receipts of the firm; in finding an excess of sixty-seven thousand two hundred and ninety-seven dollars and sixty cents in assets over liabilities; in holding Brinkman responsible for the same; in finding Brinkman indebted to Koelz in the sum of eighteen thousand two hundred and twenty-three dollars and eighteen cents; in taking exhibit Z as correct in finding total disbursements and discarding it in ascertaining the total receipts; and in finding that prior to May 1, 1887, all the money of the firm had been paid out except one thousand one hundred and forty-six dollars and thirty-seven cents, balance in bank, either in the business of the firm or withdrawn by Brinkman for his individual use. That all these objections are well taken, will be seen

by reference to the full statement of the facts in the case here-inbefore detailed. There was no settlement between the parties May 1, 1887, and the striking of an alleged balance by the commissioner as of that date was not only unnecessary but wrong, as tending to confusion. The conduct of the business was without intermission and without a settlement from May 1, 1874, until March 1, 1894, with the same men jointly in charge of it. Another ground of objection stated in the same exception is that the commissioner exceeded the authority conferred upon him by the decree. This exception is well taken. The reference to Commissioner McMullen was not general, as has been stated, but that it may more fully appear, the substance of the order of reference is here set out: "The court, without passing upon said reports and the various exceptions thereto, being of opinion that there should be a more full and definite settlement of the individual account of George Brinkman with the firm of Brinkman & Co. before the court passes upon the various matters of said report and special report filed as aforesaid, doth adjudge, order and decree that this cause be referred to J. N. McMullen, a special commissioner who shall settle and adjust the individual account of said Brinkman with the firm of Brinkman & Co. and also that of Koelz with said firm, if desired by either party." With the stating of the account between Brinkman and the firm of Brinkman & Co., the work committed to him was completed. Even if his theory of holding Brinkman responsible for all the receipts of the firm and his method of arriving at the amount for which he should be held liable were correct, he was only authorized by the decree to ascertain and report the amount due Brinkman from the firm or from him to the firm. But he went beyond that and made a settlement of the entire partnership account, without showing separately and distinctly what he was directed to find and report. But, as there was no evidence of any fraudulent appropriations by Brinkman, there was no occasion for any finding, by Commissioner McMullen, as to the receipts and expenditures of the firm. Under such circumstances, those findings are only valuable or necessary for the purpose of ascertaining the assets of the firm in settling the partnership accounts, a matter, which was not committed to him. Hence, the first fourteen exceptions of the defendant to the report, relating to the findings as to receipts and disbursements,

should have been sustained as well as the other exceptions herein discussed.

The special report of Dr. Turner is wrong in assuming six hundred seventy-two thousand two hundred and fifty-two dollars and seventy cents to be the total amount of disbursements, as has been shown. It is also wrong in not having settled and stated the account between Brinkman and the firm before attempting to ascertain the assets and settle the accounts between the co-partners. His statements are long and involved, and similar to that of Commissioner McMullen, and do not show any separate and distinct settlement of the account between Brinkman and the firm. None of the commissioners find that there was more than seven hundred and six dollars cash on hand at the date of dissolution. The stock only invoiced seven thousand two hundred and forty-eight dollars and fifty-two cents. The good accounts amounted to three thousand and fifty dollars. Whatever the firm had as additional assets were debts due from Koelz or Brinkman or both of them. Whether such indebtedness was legitimately and regularly incurred or fraudulently and clandestinely made, is wholly immaterial in settling the account. It must be ascertained before any settlement of co-partnership accounts is undertaken, and the findings as to these individual accounts must be based upon evidence, and not arrived at by mere manipulations of figures. Figures are truthful, but a little confusion in them will produce very incorrect results.

In stating Brinkman's account with the firm, he should be charged with the store account against him, with all the money he has withdrawn, and with all the money paid out of the firm fund or funds, deposited in the banks in the firm name, in satisfaction of, or on, his debts, and, if he has fraudulently appropriated to his own use any of the firm money, he should be charged with that. He should be credited with all the firm owes him for rent, clerk hire, boarding of clerks and all the firm may owe him on any other account, and also with all the money he has paid into the firm by way of advancements, but not with his original contribution of capital, as that is to be considered only in ascertaining the profits for division and in distributing the assets between the partners. If, in that way, it is found that the firm is indebted to Brinkman, it must be treated as any other debt, except in cases of insolvency, and paid out of the

assets. If he owes the firm, his indebtedness to it becomes part of its assets. Koelz's account should be settled in the same way.

These settlements having been made, the net assets of the firm should be ascertained by adding together the cash on hand, the value of the stock of goods, the total amount of the good accounts due the firm, the amount due it from Koelz, if anything, and the amount due from Brinkman, if anything, and then subtracting from the total assets, thus found, the aggregate of the firm's liabilities, to be ascertained by adding together the amount of the debts it owes third persons, the amount it owes Brinkman, if anything, and the amount it owes Koelz, if anything. Having thus found the net assets of the firm, the total amount of original capital should be deducted, to ascertain the profits of the business, which, under the co-partnership contract, are to be divided equally. The profits being ascertained and divided, it remains only to state the accounts between the members of the firm.

In doing this, it must be remembered that Brinkman has taken all the firm's assets and assumed all of its outstanding indebtedness, from which it results that the settlement must be varied from what it would be, had not Koelz retired. Hence, Brinkman must be charged with the value of the stock of goods, the cash on hand, the amount of solvent accounts due the firm, and what he owes the firm, if anything. Then he is to be credited with the firm indebtedness to third parties, assumed by him, with the capital contributed by him, with his one-half of the profits, and with what the firm owes him on account, if anything. The balance then struck will show what he owes Koelz or what Koelz owes him, as the case may be. Koelz's account is to be charged with what he owes the firm, if anything, and credited with his original contribution to the capital, his share of the profits and what the firm owes him, if anything, and the balance then struck will show what he owes Brinkman, or what Brinkman owes him, as the case may be.

From what has been said of the several reports, it clearly appears that none of them have followed this plan of settlement. The statements and findings in all of them are based upon erroneous principles and assumptions and are, therefore, all wrong, for which reason, the decree must be reversed and the exceptions to all the reports sustained, and the cause recommitted for settlement in accordance with the principles here announced.

This basis of settlement accords fully with the principles announced in *Hyre* v. *Lambert,* 37 W. Va. 26, where it is held that "The assets of a firm are to be applied in the following order: First, in payment of the debts and liabilities of the firm to persons who are not partners; second. in payment to each partner ratably of what is due from the firm to him for advances as distinguished from capital; third, in payment to each partner ratably of what is due from the firm to him in respect of capital; fourth, the ultimate residue, if any, is divisible among the partners in the proportion in which profits are divisible under the partnership contract." It is only varied so far as is made necessary by the peculiar circumstances of the case. Brinkman stands in the place of "persons who are not partners," having debts against the firm, for he has assumed the payment of those debts, and must be substituted to their rights against the assets. The application of an additional principle is made necessary by reason of Brinkman's having taken all the assets under the dissolution agreement. See 2 Lindl. Pratn. 973; 2 Bates Pratn. ss. 810, 811, 812 and 818. "What each is entitled to charge in account with the others, including whatever each has brought in, whether as capital or advances, and whatever each should have brought in but has not done so, and what each has taken out more than he ought, should then be ascertained, and the profits to be divided or the losses to be made. good should be apportioned, ascertaining what each must pay to the others in order to settle all cross-claims, the capital being required to be first divided and repaid to the party contributing it before dividing, and in order to ascertain the amount of the profits." 17 A. & Eng. Ency. Law 1197. In an account, "The principal matters to be shown are the beginning, end, and the extent of the partnership business, the amount due from the firm to each partner or from the partners to the firm, the debts of the firm, its assets, and a statement of the profits or losses." 15 Ency. Pl. & Pr., 1103.

The decree complained of is to be reversed and the cause remanded for further proceedings according to the principles and directions herein announced and given and according to the rules and principles of equity.

*Reversed.*