# CHARLESTON.

### DANIEL *v.* GILLESPIE.

Submitted September 3, 1908.    Decided March 23, 1909.

1. EQUITY—*Jurisdiction—Concurrent.*
     Generally courts of law and equity have concurrent jurisdiction of causes of action, arising out of fraud, accident or mistake. (p. 369.)

2. PARTNERSHIP—*Settlement of Accounts—Jurisdiction—Equity.*
     Settlement of partnership accounts is within the exclusive jurisdiction of courts of equity. (p. 369.)

3. SAME—*Jurisdiction—Fraud.*
     Though the law affords a remedy by action for fraud and deceit, perpetrated in affecting a settlement of partnership affairs, the jurisdiction of the law courts in such cases is not exclusive, and resort may be had to a court of equity to correct the settlement by surcharging and falsifying it as to certain items, or to set it aside wholly and judicially settle the accounts. (p. 369.)

4. SAME.
     The establishment of fraud on the part of one of the parties' in stating an account between partners entitles the other to have it wholly set aside and restated in a court of equity. (p. 369.)

5. SAME—*Private Settlement of Accounts—Fraud—Relief—Restoration.*
     If, in a private settlement of partnership accounts, fraud has been committed by one of the parties to the injury of the other, the latter may have relief in equity without restoring to the former what he received in the settlement. (p. 370.)

Appeal from Circuit Court, McDowell County.

Bill by W. C. Daniel against Grattan Gillespie. Decree for defendant, and complainant appeals.

*Reversed.*

T. L. HENRITZE and LAWSON WORRELL, for appellant.

D. J. F. STROTHER, D. E. FRENCH, and W. L. TAYLOR, for appellee.

POFFENBARGER, JUDGE:

W. C. Daniel brought this suit in the circuit court of McDowell county to set aside his purchase of his co-partner's interest in a store, cancel his negotiable promissory notes given therefor, and settle and wind up the partnership business. The court, on final hearing, dismissed his bill and he has appealed.

Prior to January 1, 1904, he owned a retail store at North Fork in said county and, on that day, sold an interest in it to the defendant Grattan (Grat) Gillespie. He put in his merchandise at a valuation of $11,148.95. Within a year thereafter he paid into the business, in some form, $3,836.01 additional and Gillespie $2,028.13. Neither was to have any salary and Daniel was to own three-fourths of the business and Gillespie the remaining fourth. The firm seems to have lost considerable money during the year, for, in the following February, the stock invoiced $8,163.16, there were accounts due the store, amounting to $1,444.76, and debts due from it, amounting to $10,513.60. On February 1, 1905, Daniel bought Gillespie's interest for the sum of $2,185.00, executing his three negotiable promissory notes therefor. On April 27, 1905, he brought this suit for the purpose above stated. His bill admits knowledge of firm losses at the time he bought and the clamor of creditors for payment of past due bills, and avers the purchase was made for the purpose of obtaining possession of the business, to the end that its exact condition might be ascertained and a settlement made without incurring the expense of a receivership. It says the plaintiff, on conferring with the defendant about the state of the business and attempting to purchase his interest, found the latter unwilling to agree to any equitable and just settlement. The latter threatened to bring a suit to dissolve the partnership and have a receiver appointed, and, rather

than have this done, the plaintiff executed to him notes covering the amount he had put into the business, and so obtained possession. It charges the firm losses to alleged dishonesty and neglect of business on the part of the defendant, specifying numerous instances of such misconduct. The answer denies all these allegations and evidence was adduced in support of both parties. The commissioner, after considering all of it, came to the conclusion that the defendant had clandestinely withdrawn from the business more than $1,200.00 in money, depositing it in his own name in two banks, distant from the one in which the firm kept its deposits. He further finds the defendant was extravagant in his expenditures and habits, and negligent in business, but is unable to ascertain what sums were squandered by him. Being of the opinion, in view of these facts that the contract of sale should be set aside, he stated and reported an account between the parties, showing that Daniel had sustained a loss of $554.34 in excess of the amount which he should bear. Twelve exceptions to this report were filed and it was recommitted to give the defendant an opportunity to take further evidence to prove the money deposited by him as aforesaid had been derived from sources other than the social business. Additional evidence was taken but the commissioner held it insufficient to justify a different conclusion from that at which he had previously arrived. But, perceiving a slight error in his calculations, he restated the account and found that Daniel's loss, in excess of what he should have borne, was $561.84. Nineteen exceptions to this report were filed. On the hearing, the court differed from the commissioner in respect to the weight of the evidence, and sustaining exception No. 2 to the last report, based on insufficiency of evidence, as well as a number of others, subsidiary in character, dismissed the bill.

A cross-assignment of error, based on the overruling of the demurrer to the bill, raises the question of equity jurisdiction, adequacy of legal remedy by an action for damages being assigned as the reason for lack thereof. The authorities invoked for this proposition do not sustain it. In *Childers* v. *Neeley*, 47 W. Va. 70, the partnership had been dissolved and a settlement made. The only matter alleged against the defendant was his failure to execute a bond of indemnity to the plaintiff. It appearing to the court that the partnership business had been

settled, this was held conclusive in the absence of allegation and proof of any ground for setting it aside, such as accident, mistake or fraud. The case of *Mahnke* v. *Neale,* 23 W. Va. 57, is very similar. Jurisdiction in equity to set aside a settlement for fraud is acknowledged in both cases. Relief was denied, not because the plaintiffs had invoked an inappropriate remedy, but because the allegations and proof were insufficient to justify the relief prayed. *Crockett* v. *Burleson,* 60 W. Va. 252 (54 S. E. 341), merely declares jurisdiction at law to recover damages for fraud and deceit on the part of the defendant in the execution of a contract of dissolution and settlement. It does not deny jurisdiction in equity for rescission of a voidable contract and a settlement of the partnership business in equity. *Mc-Cauley* v. *Cooley,* 45 Neb. 583, is to the same effect. It is hardly necessary to remark that generally courts of law and · equity have concurrent jurisdiction of causes predicated on fraud, accident and mistake, nor that equity is the proper forum in which to obtain an accounting, dissolution and settlement respecting a partnership. 15 Enc. Pl. & Pr. 1054; 30 Cyc. 715. Such jurisdiction is not denied in the briefs of counsel as we read them. It is only insisted that the settlement, effected between the parties by the purchase of the interest of one by the other, gives an adequate remedy at law, and therefore precludes jurisdiction in equity. The authorities do not sustain this position. There is jurisdiction in equity to correct errors in accounts stated between partners, by surcharging and falsifying the statement, and when the plaintiff is entitled to wholly set aside the settlement made, he has the further right to a settlement in the same suit under the rules and principles prescribed by law and equity. Matters of account are *per se* within the scope of equity jurisdiction. 2 Story's Eq. Jur., sec. 441. In respect thereto, courts of law and courts of equity have concurrent jurisdiction. *Id.* sec. 442; *Tillar* v. *Cook,* 77 Va. 472.

If the object of the suit were merely to prevent collection of the notes by establishing fraud in the procurement thereof or failure of consideration, in whole or in part, it seems clear that these matters of refence might be set up in a court of law, and there might be no jurisdiction in equity; but the relief sought by the bill does not stop with this. It goes entirely beyond the mere matter of defense and includes a settlement of the partner-

ship affairs. When a stated account between partners is vitiated by fraud or involves a mistake affecting the whole thereof, it is set aside and a new settlement and statement made; but, if the mistake does not go to the entire account and is limited to certain items, correction is made by surcharging or falsifying, or both, according to the nature of the errors, all items except the erroneous one being allowed to stand. The establishment of fraud in respect to any item or part of the account, unlike mistake as to an item or items, impeaches the entire settlement. *Allfrey* v. *Allfrey,* 1 Mac. & G. 87; *Williamson* v. *Barbour,* 9 Chy. D. 529; *Gething* v. *Keighley,* 9 Chy. D. 547, 550; Lindley Part. 969, bottom p. 1256; Collyer Part., sec. 298.

We do not stop to discuss so plain a proposition as that the purchase or settlement, which ever it may be termed, may be set aside on allegation and proof of fraud on the part of the defendant; but a matter worthy of consideration is, whether the plaintiff, having obtained possession of the property by this purchase, and desiring to set aside the contract for fraud, must restore the property to the possession of the defendant, or admit him to joint possession and control thereof as a condition precedent to relief, and the authorities answer this proposition in the negative. *Oliver* v. *House,* 125 Ga. 637; *Wallace* v. *Sisson,* 33 Pac. 496; *Elfelt* v. *Hart,* 1 Fed. Rep. 264; *Abrahams* v. *Hunt,* 26 Pa. St. 49. "A partner who has been defrauded into a private settlement may institute a suit for a judicial accounting, without rescinding the settlement and putting the defrauding partner *in statu quo.*" 30 Cyc. 713. The reason for differentiating such a case from one of rescission of a contract of purchase between strangers is apparent. Before the sale, each had right of possession and the possession of each was the possession of the other. By giving notice of election to rescind the purchaser virtually puts the seller *in statu quo,* except that he expects to retain the assets at their real value, with assent of the other party, without relinquishing his right to a just and fair settlement of the accounts. *Abrahams* v. *Hunt,* cited, allows a partner to set aside a release executed to his co-partner, by showing that the latter coerced the execution thereof by unjustly withholding the books and acting unfairly in other respects, and does not require him to restore what he obtained in the private settlement, as a condition precedent.

As has been stated, the bill charges the defendant with dishonesty and neglect of duty, specifying a number of instances, including the secret withdrawal and depositing of the firm's money in his own name, and avers the plaintiff's ignorance of such conduct at the time of his purchase. Plaintiff avers that, since the dissolution, he has learned that the "defendant was regularly, systematically robbing him, not only during the period of said partnership, but prior thereto, while the said defendant was employed as a clerk or salesman in his business." A further averment of ignorance of the fraud reads as follows: "The amount paid by the plaintiff to the defendant (and for which notes were given) was paid without knowledge of the conduct of the said defendant." We do not doubt the sufficiency of these allegations. They charge the fraud and the plaintiff's ignorance thereof, at the time of the dissolution and the settlement, speficially setting forth certain instances, and thus show the plaintiff was imposed upon in the settlement.

Enough has been stated to indicate that the vital questions in the case are, (1) whether the evidence adduced by the plaintiff, considered alone, sustains the allegations of the bill; and (2), if it does, whether the evidence adduced by the defendant is sufficient to relieve him from the imputations of fraud thus cast upon him. Numerous witnesses testify to the reckless and dissolute conduct of the defendant. His habitual and persistent association with lewd women and reckless expenditures of money upon them and in other ways are abundantly shown. Many specific instances of misconduct are related, but the one most clearly indicating fraudulent intent, and, therefore, the gravest and most serious, as regards this case, is his conversion of money into a check in the name of a third party and causing the check to be assigned to him and then depositing it in his own name in a bank other than the one in which the firm money was kept. This is hardly reconcilable with any intent or purpose other than that of defrauding his partner. J. A. Jackson says Gillespie gave him fifty dollars and asked him to go up to Mr. Toney's office and obtain the latter's check for that amount in his own name and bring it back to him, which was done. Toney says Jackson brought him the money and he gave the check as requested which came back to him, bearing the endorsements of Jackson and Gillespie and showing it had passed

through the Tazewell National Bank in which Gillespie made individual deposits. Gillespie offers no explanation of this. He merely says he does not remember anything about it. J. A. Lay testifies to having deposited thirty-three dollars in the bank of Keystone for Gillespie and to Gillespie's having requested him to make another deposit for him on another occasion. He further says he was in the store on one occasion when Gillespie told him he must send a check to the bank and sat down to write, saying he was writing to the bank, and, observing Daniels coming into the store, he arose and tore up the letter. The check he proposed to send away was a railroad check, amounting to ninety-odd dollars. C. E. Harman says Gillespie had forty dollars deposited with his wife for safe keeping for a short period of time. Gillespie bought from T. P. Mason a locket in December, 1904, for the sum of fifteen or eighteen dollars, telling Mason not to let Daniels see it. He admitted having spent $75.00 on one trip to Bluefield. Witness after witness testifies to his having frequented houses of ill fame, having had lewd women in the store, and the loitering of that class of women in and about it. As he was a man of practically no means or property other than what he had invested in the store, it is perfectly manifest that he could not maintain himself in that sort of life, and, at the same time, accumulate deposits, without drawing money from the firm business. That he did this clandestinely and in a manner indicating fraudulent intent is disclosed by his having made the deposits in banks other than the one in which the firm deposits were made, his having failed to charge himself with the money on the books of the firm, and his having cautioned persons with whom he had financial transactions not to disclose them to his partner. The circumstances, viewed as a whole, are, we think, sufficient to establish the charge of fraud. After the report was recommitted to allow him to exculpate himself, he attempted to indicate the sources from which he derived some of the money deposited, but his attempted explanation relates only to deposits made prior to the formation of the partnership, and, as to these, is not very satisfactory. As to a deposit of $71.00, a check of W. C. Daniels, he says "I don't remember what that was for." As to another check of Lester G. Toney, he said "I don't remember what this other one was, $50.00." In fact, this

is the check he procured by Jackson with money furnished him. There are several other items that he does not explain. As to a check of Aaron Catzen for $40.00, one of W. M. Kinsey for $35.00 and another of Lester G. Toney, he says nothing. Another check for $50.00, drawn by Aaron Catzen, he accounts for by saying he cashed it for Catzen, but does not say where he got the money with which to cash it and others he says he cashed. No explanation whatever is offered by him as to numerous and considerable deposits made after the first day of January, 1904, amounting to several hundred dollars. During all this time he charged himself on the books with only $32.00. This he explains by saying he had no occasion to buy much and had money for things he could not obtain in the store. A deposit of $108.00 in his name in the Keystone bank was found. This, he says, was money belonging to Charles Harman and James Crawford, which he had collected as rent from their tenants. It appears that he did collect considerable money for them, but Harman says he had accounted for all of it except sixty dollars which he claimed had been paid into the business of W. C. Daniels & Co. This statement of Harman's is not denied by him. This is sufficient to indicate the character of his testimony. Of it, the commissioner said:

"The defendant denies that he had misappropriated any of the partnership funds, and in general terms says that none of the money deposited in the bank by him as shown by the evidence of W. T. Gillespie, belonged to the partnership or to the plaintiff. He is asked by his counsel to explain the different items set out in the statement filed with Gillespie's deposition as deposits made by him, and he explains and accounts for the various amounts deposited prior to the formation of the partnership, but he fails to explain a single item embraced within the partnership period.

"The commissioner in his former report charged the defendant with those deposits, only, which were made during the continuance of the partnership, and he was not charged with a single item deposited prior to that date. His failure to explain a single item and to account for a single deposit made during the continuance of the partnership, and with which he was charged in the settlement adopted by the commissioner, in his former report, is, in the mind of your commissioner, significant

to say the least, and has the effect to confirm the commissioner's opinion as embodied in his former report, and he therefore adopts the theory of settlement heretofore adopted and reported, and asks that said former report be considered as part of this report, with the exceptions hereinafter noted.

"Some evidence was given by the defendant tending to show that he had some income other than that from the partnership business, but in the opinion of your commissioner he fails to show that he actually had such income from Jnuary 1, 1904, to February 1, 1905, the period of the partnership, but all the evidences of sales of cattle, farm products, etc., shows that these sales were made before or after this period. Your commissioner therefore finds that the evidence is insufficient to overcome the case heretofore made out, and upon which his former report was based."

After a careful examination of the evidence in question, we fully concur in the commissioner's estimate of it, from which it results that, in our opinion, the circuit court erred in sustaining the exceptions to his report.

We have examined the report of the commissioner and the appellee's exceptions thereto, finding no errors therein to his prejudice. The account is not stated on correct principles, but the result is to the prejudice of Daniel, who does not complain of the commissioner's report, and asks a decree in conformity therewith. Therefore, the decree complained of will be reversed, and a decree will be entered here, ordering the surrender and cancellation of the notes mentioned and described in the bill and proceedings, confirming the commissioner's report, and requiring the appellee, Gillespie, to pay to the appellant, Daniel, the sum of $561.84, with interest thereon from the 29th day of May, 1907, until paid, and costs in this Court and the court below.

*Reversed.*