# CHARLESTON.

DWIGHT H. TETER, ADM'R. v. SAMUEL A. MOORE.

Submitted April 18, 1917.    Decided May 8, 1917.

1. PARTNERSHIP—*Bill for Accounting—Plea in Equity—Sufficiency.*

A plea denying the existence of a partnership relation, accompanied by pleas of the statute of limitations, interposed to a bill alleging a partnership between the plaintiff and defendant and frauds and errors in settlements of the alleged partnership business, and praying annullment of the settlements and ascertainment of the true state of the affairs of the partnership and the rights of the parties, is not a sufficient plea in equity, in the technical sense of the terms. (p. 447).

2. SAME—*Bill for Settlement—Plea of Laches.*

Nor is laches proper matter, in such a case, for such a plea, because application of the principle the plea invokes cannot be determined without consideration of the evidence pertaining to the several demands set up in the bill. (p. 447).

3. APPEAL AND ERROR—*Partnership—Separate Pleas of Statute of Limitations—Harmless Error.*

Separate pleas of the statute of limitations, to the several demands stated in such a bill are proper, but, if an answer tendered with such pleas invokes the statute of limitations generally, and the cause is heard and its merits developed on the bill and answer, erroneous rejection of the pleas is harmless. (p. 447).

4. SAME—*Harmless Error—Premature Reference.*

The error in an interlocutory decree prematurely referring to a commissioner, a cause in which the depositions were subsequently taken before the commissioner and notaries, at sundry places, the cause fully developed on its merits and a decree entered, settling the principles thereof, is harmless and insufficient ground for reversal of such decree, if it is sustained by the pleadings and proof. (p. 449).

5. EQUITY—*Reference—Disqualification of Commissioner—Waiver.*

Disqualifying interest on the part of a commissioner to whom a cause is referred is waived by a party who, having full knowledge of such interest, makes no objection to the appointment of the commissioner and permits the procedure before him to go on, without objection. (p. 450).

6. PARTNERSHIP—*Bill for Accounting and Settlement—Scope.*

A bill attacking one partnership settlement, on the grounds of error and fraud, by complaint as to particular items or parts

thereof, and a subsequent one showing no correction of errors or wrongs in the first, by allegations of procurement thereof by misrepresentations made with intent to cheat and defraud the plaintiff, is broad enough in its allegations to include the second settlement.   (p. 450).

7.  SAME—*Purposes—Purchase and Sale of Realty.*

Purchase and sale of real estate for profit' may be made the primary subject matter of a partnership agreement.   (p. 450).

8.  SAME—*"Partnership Agreement"—Contract for Procuring Option.*

A written contract providing for procurement of options on coal in place, by one of the parties thereto, for the mutual and equal benefit of both and for equality of burden as to expenses and advantages as to profits, under which large areas of coal are purchased and disposed of for profit, constitutes a partnership agreement.   (p. 450).

9.  SAME—*Partnership Agreement—Construction.*

Though such an agreement specifies certain territories in which the enterprise is to be conducted and an indefinite maximum of coal to be optioned, it extends to coal in other neighboring and adjacent territories, increasing the aggregate beyond that mentioned, bought and sold to the same party, within the period of the operations contemplated by the written agreement and in the same or a similar manner, and the proceeds of which are treated and disposed of as if they were within the terms of the agreement.   (p. 459).

10.  LIMITATION OF ACTIONS—*Obstruction of Cause of Action.*

As to matters included in a partnership settlement, the statute of limitations runs from the date of the settlement, and, after five years from that date, the settlement cannot be impeached or set aside otherwise than by allegation and proof of obstruction of the right of action thereon, within the meaning of sec. 18, ch. 104 of the Code.   (p. 461).

11.  SAME—*Obstruction of Right of Action.*

Allegation and proof that a party to such a settlement, having the custody of social property and funds, authority to incur and pay expenses and make, and cause to be made, entries of such expenses in the firm books, as charges against its assets, made entries therein of large charges, as for expenses paid, of money which had not been paid and for payment of which there was no obligation, right or basis and so procured a settlement leaving such sums of money in his own hands as secret, wrongful and clandestine profits, makes out a case of obstruction of right of action, within the meaning of said statutory exception.   (p. 461).

12. SAME.

A bill charging such a state of facts, without an allegation of concealment of the fraud, in terms, sufficiently alleges obstruction of right of action, since the act complained of naturally and necessarily conceals itself. (p. 461).

13. EVIDENCE—*Judicial Admission.*

An answer to such an allegation, admitting the existence of the charges on the books, not denying the making thereof by the defendant, or at his instance, and averring payment of the money represented by them to a person other than any of those named in the entries, for the persons so named, is a judicial admission that such sums were paid out and not retained, and is conclusive upon the defendant in all of its tendencies, bearings and aspects, wherefore evidence of rightful retention thereof is neither admissible nor probative. (p. 462).

14. LIMITATION OF ACTIONS—*Obstruction of Right of Action.*

An entry made in partnership books, by a member of the firm, of a credit to himself for services rendered, which the other member, having access to the books, could have discovered by the exercise of ordinary care and diligence, does not, in and of itself, work such concealment as obstructs right of action and makes out a case within the exception provided by sec. 18, ch. 104, Code, even though such entry may be fraudulent. (p. 464).

15. PARTNERSHIP—*Settlement—Invalidity—Fraud.*

Establishment of fraud, by a member of a copartnership, in the making of a settlement of the partnership business and affairs, between or among the members thereof, vitiates the entire settlement in which it was perpetrated and all subsequent settlements based thereon, .and such settlements will be wholly set aside and restated in equity, on judicial complaint of the injured party. (p. 465).

16. EVIDENCE—*Extrajudicial Admission—Rebuttal.*

An extrajudicial admission, or one made in a suit or action other than the one in which it is relied upon and between other parties, is not conclusive upon the party by whom it was made, and it may be overthrown by other evidence. (p. 465).

17. WITNESSES—*Impeachment—Contradictory Statements.*

A witness testifying on cross-examination, as to matter concerning which he did not testify on his examination in chief, may be impeached or contradicted by the party who introduced him, as to such matter, by proof of his statements variant from his testimony on cross-examination, relating thereto. (p. 465)..

18. PARTNERSHIP—*Partnership Assets—Contribution.*

A partner who has been compelled to pay notes and other obligations assigned by the firm and endorsed by him jointly with his copartner has right of reimbursement from the firm assets and contribution from his copartner in the event of insufficiency of firm assets. (p. 466).

Appeal from Circuit Court, Barbour County.

Bill by Dwight H. Teter, administrator, against Samuel A. Moore, for the annulment of a partnership settlement, and for the ascertainment of the true state of partnership affairs, and of the rights of the parties. Decree for complainant, and defendant appeals.

*Affirmed in part.  Reversed in part.  Remanded.*

*Cato & Bledsoe, Wm. T. George* and *J. Blackburn Ware,* for appellant.

*J. Hop Woods* and *Harry H. Byrer,* for appellee.

POFFENBARGER, JUDGE:

If the procedure and practice in this cause are sufficient to raise them, the three vital questions developed are; (1), whether a copartnership respecting the subject matter of the controversy or a joint interest so far analogous to a relation of copartnership as to make applicable, in the settlement thereof, the principles governing a settlement of copartnership matters, existed between the plaintiff's decedent and the defendant S. A. Moore; (2), whether any settlements were made between the parties to such relation; (3), whether, if, in any settlement, the defendant perpetrated fraud upon the plaintiff's decedent of such character and extent as, in law, wholly and entirely vitiates the settlement. The circuit court, regarding the procedure as sufficient, entered upon these inquiries, responded to them affirmatively, by its decree, set aside the settlements found to have been made, and ordered a full and complete accounting. Defense was made under the equitable principle of laches and the statute of limitations. Of the two statements revealed and relied upon as settlements, the bill specifically attacks only the first. Relying upon the second as being final, complete and conclusive, the

defendant denies the sufficiency of the bill to reach it. A demurrer and answer in one instrument and twelve separate special pleas were tendered at the same time. The first plea denied the partnership, the second set up an account stated, the third interposed the defense of laches and the other nine set up the five year statute of limitations against the several demands of the bill, predicated upon allegations of fraud and mistake. All these defenses were likewise made in the answer. On motion of the plaintiff, the court struck out all of the special pleas, except plea No. 2, and then the defendant withdrew that plea. Assignments of error are predicated upon these rulings. Alleged prematureness of the decree of reference to a commissioner is the ground of another assignment of error. Another ground of complaint is the overruling of an exception to the commissioner's report, on the ground of disqualification by reason of interest.

The bill filed by the decedent in his lifetime alleged the existence of a partnership between himself and the defendant, entered into, in 1902, only partially settled and remaining undissolved. It exhibited a statement dated, October 19, 1906, relied upon as a partial settlement, showing assets to the amount of $27,027.39, and an excess of resources over liabilities, amounting to $15,659.24. This statement was based upon books alleged to have been kept by the defendant, and the bill charges that the defendant made, or caused to be made, numerous fraudulent entries and omissions in the books, and that the plaintiff, relying upon the honesty and integrity of the defendant, believing the books had been properly kept and having no cause or reason to suspect the contrary, did not discover the alleged frauds, until a short time before the institution of the suit.

No doubt special plea No. 1, denying the partnership relation, and the pleas of the statute of limitations were intended to operate as companion pleas, reducing the defense to a single point, in conformity with the rule applicable to pleas in equity. If there was a copartnership which had not terminated, at the date of the commencement of the suit, the statute had not begun to run against the unsettled part of the account. Code, ch. 104, sec. 6. If there was no such relation,

nor anything in the nature of the contract which deferred the commencement of the operation of the statute, it would run against each item of the account, and every demand set up by the bill would be barred. These pleas, however, do not so operate. The relation of partnership or merchant and merchant trading together, are not the only instances of postponement of the statute. A continuing contract, whatever its nature may be, is not subject to the operation of the statute of limitations, until it has been completed. *Rowan* v. *Chenoweth,* 49 W. Va. 287; *Douglass* v. *Ry. Co.,* 51 W. Va. 523; *Schoonover* v. *Vachon,* 121 Ind. 5; *McCay* v. *McCowell,* 80 Ia. 146; *Morrissey* v. *Faucett,* 28 Wash. 52; Page, Cont., sec. 1656; 1 Rob. Pr. 488; 1 Wood, Lim. 347; Angell, Lim. s. 181; *Hopkins* v. *Hopkins,* 4 Strobh. (S. C.) Eq. 207; *Estes* v. *Stokes,* 2 Rich. (S. C.) 320; *Land Co.* v. *Dance,* 35 S. E. 720. If these ten pleas, No. 1 and 4 to 12 inclusive, could be regarded as reducing the case to a single point of defense, concluding the cause and absolving the defendant from defense on the merits, is sustained by proof, agreeably to the requirements of the plea in equity, it may be that they should have been entertained. But they have no such effect. Although, strictly speaking, there may have been no relation of partnership between the parties, there may have been a continuing contract between them, giving rise to demands by each against the other, not subject to the operation of the statute of limitations, until after final and full completion of the contract, or dissolution of the relation.

Manifestly, the matter set up in the third special plea does not constitute ground of a good plea in equity. To determine whether right to relief is barred or lost by reason of the defendant's inability to produce books, papers, contracts, receipts and vouchers, due to delay in the assertion of the demands set up in the bill, it would be necessary for the court to enter upon inquiries respecting all of the demands, and determine, in each instance, whether the principle of estoppel so operates. Some of the demands might be barred in that way and others not. It would be impossible to say, in any instance, that prejudice has resulted, without consideration of the evidence. In view of this necessity, it is perfectly appar-

ent, that the plea of laches would not shorten the case. Loss of evidence essential to determination of the right respecting all of the numerous demands made, some of which are very large, could not safely be assumed. As the plea would necessarily go separately to every ground of relief set up in the bill, it would be as broad, in one sense, as an answer, and its conclusiveness as to particular demands would depend upon the state of the evidence applicable thereto. In no respect, therefore, does it comply with the requirements of a plea in equity. . Such a plea should, if sustained by proof, end the case on a single issue of fact, though that fact may depend upon numerous circumstances tending to establish it.

The decree of reference was entered on the bill taken for confessed. That state of the case may have justified entry thereof. Interposition of an answer making full defense, before the order was executed, however, may have made it the duty of the court, in strictness of procedure, to set it aside and postpone the reference until after the introduction of sufficient proof to make out a *prima facie* case. But the error of the court, respecting the order of reference, if any, is harmless and may be disregarded. The order was purely interlocutory and any error therein susceptable of correction in the further progress of the cause. The depositions, whether taken before the commissioner or notaries, were taken for all purposes of the cause and could be considered by the court, in the determination of the issues raised. A premature reference might detract from the value of the commissioner's findings, but it could have no effect upon the court's findings upon the evidence brought up with the commissioner's report, by exceptions thereto. Some of the evidence in this cause was taken before the commissioner, but numerous depositions were taken before notaries, in the ordinary way, some at Charleston, some at Fairmont and some at Pittsburg. There were exceptions to the commissioner's report, which brought them all before the court for consideration. If the decree appealed from is sustained by the pleadings and the evidence, any error in the decree of reference, therefore, will be treated as being harmless and disregarded. *Seabright* v. *Seabright,* 28 W. Va., 412, syl. point 6.

In response to the exception to the report of the commissioner, on the ground of disqualification by interest, affidavits were filed proving the defendant's knowledge of the existence of the alleged disqualifying interest, before the appointment of the commissioner, and his appearance and defense, without objection to the appointment or reference. The commissioner was a stockholder of a bank which held indebtedness against the estate of the plaintiff's intestate, and his wife was also a creditor of that estate in the sum of $773.00. Defendant's participation in the hearing, after knowledge of the relations of the commissioner to the creditors of the estate represented by the plaintiff, without objection, constitutes a waiver. *Dillard* v. *Krise,* 86 Va. 410; *Etter* v. *Scott,* 90 Va. 672; *Fox* v. *Hazelton,* 10 Pick. (Mass.) 275; *Duckworth* v. *Diggles,* 139 Mass. 51; *Carroll* v. *Lufkins,* 29 Hun. (N. Y.) 17. "So partiality or misconduct of the referee, where known to a party before the hearing, is waived by permitting the hearing to proceed without objection." 34 Cyc. 617.

The extensive transactions as to which a settlement is sought relate to purchase and resales of coal in place and coal lands, in Barbour and other counties, at prices producing very considerable profits, but the operations were attended by heavy expenses and required considerable time for effectuation thereof. They began in 1902, and were very active for a period of four or five years thereafter. Most of the properties were disposed of to J. M. Guffey of Pittsburg, Pennsylvania. Relatively small holdings of farmers were gathered up and consolidated into large areas, generally under options, and then conveyed to S. A. Moore, trustee, by whom they were conveyed by deed to Guffey. The aggregate of the proceeds of sales made to Guffey was more than $700,000.00, and the total acreage so disposed of was about 26,230.85 acres. This acreage was made up of several different sections known and designated as fields and tracts. They were the Moatsville Field, 4159.47 acres, sold at $40.00 per acre; the South Philippi Field, 1244.05, acres, sold at $38.00 per acre; the Teters Creek Field, 2932.12 acres, sold at $40.00 per acre; the Henry C. Harris Field, 387.19 acres, sold at $23.00 per acre; Meadowville Field, 7570.6 acres, sold at $20.00 per acre; the Be-

lington Field No. 1, 2776.29 acres, sold at $36.00 per acre, the Barker District Field, 6411.75 acres, sold at $20.00 per acre; the Belington Field No. 2, 500.58 acres, sold at $36.00 per acre; and the Fridley tract or Field, 248.8 acres, sold at $28.00 per acre. The total expenses of the enterprise were set forth in the statement of October, 1906, as having been $148,585.04, the larger items of which are $13,004.38 for interest and discount, $13,013.53 for incidentals, $4,905.84 for legal services, $106,671.12 for commissions paid, $3,109.01 for surveys and expenses thereof, $1,500.00 for expenses of litigation over what is known as the Bowman-Rainey property, and $1,289.65 for salaries of stenographers. This statement shows profits had been distributed to Teter and Moore, respectively, amounting to $41,731.95 and $41,731.94, a total of $83,463.09. At that date, the remaining assets, consisted of some small tracts of surface land, one of coal, certain notes, judgments, small deposits and stocks and bonds, amounting to $27,027.59, and exceeded the liabilities by $15,659.24.

The general character and scope of the statement exhibited with the bill have already been indicated. Another paper relied upon by the defendant as evidence of a complete and final settlement between the parties, is, in form, a receipt and statement, and bears date, July 23, 1907. By it, Teter acknowledged the receipt of Guffey's draft, dated October 4, 1906, and to become due and payable twelve months from that date. Besides this acknowledgment on the part of Teter, it contains a statement of resources, amounting to $18,856.06 and liabilities amounting to $10,586.75. It declares Teter's ownership of a one-half interest in the assets, its truthfulness as a statement of the affairs of S. A. Moore, Trustee, Teter's joint interest therein with said Moore and non-existence of any other resources of any kind or character belonging to them jointly or as partners and says it shows a full settlement. More than one-half of the resources consisted of drafts accepted for purchase money of coal sold, one for $5,000.00, one for $1,081.35 and another $3,526.99. The bill does not attack any of the items in the statement of July 23, 1907, but it does not wholly ignore the paper. It admits the execution of the receipt, but charges the defend-

ant with having procured the same by the false and fraudu-
lent representations that the statement was correct and the
amount receipted for was all that was due the plaintiff at the
date of the execution thereof.   The answer exhibited the re-
ceipt and statement and relies upon it as a full and complete
settlement and adjustment of all matters between the parties.
The second paper makes no reference to the first, nor does it
purport to make any corrections of any errors or false en-
tries therein or in the books.   Some of the assets listed in the
two statements are identical.   During the period of about
nine months, intervening between them, the resources were
reduced to the extent of about $9,000.00 and the liabilities
to the extent of about $2,000.00.   If the enormous departures
from the truth, alleged to have been made by the defendant,
in the books and first statement, with intent to cheat and de-
fraud the plaintiff, had been corrected in the second state-
ment, the resources would necessarily have been increased by
many thousands of dollars.   The bill charges that the item
of commissions in the statement, amounting to more than
$106,000.00 contains a false and fraudulent charge of over
$18,500.00, and there is no item in the list of classified ex-
penses that disclosed a charge made in Moore's favor, for
services respecting one of the fields, amounting to $5,000.00.
The bill charges errors, frauds and mistakes in the books and
the statement of October, 1906, amounting to about $58,000.00
in the aggregate.   If there is any presumption that errors in
the first statement were corrected in the second one, relating
to the same subject matter, the allegations of the bill mani-
festly overthrow it.   It is utterly impossible that these large
corrections could have been made in the second statement.
They would have increased the resources to about $85,000.00
and the excess of resources over liabilities to about $63,000.00.
The bill attacks both statements as well as the books.   As to
the former and the books, it goes into details and specifically
points out alleged errors and frauds.   Though it attacks no
particular item of the second statement, it charges procure-
ment thereof, by false representations made with intent to
cheat and defraud the plaintiff.   Manifestly the bill is broad
enough to reach both papers.

In response to the defendant's broad denial of the existence of the verbal contract alleged in the original bill, an amended bill produced and exhibited a written agreement, dated July 25, 1902, disclosing the essential elements of a contract of copartnership, as to the profits to be derived from coal under land in Glade and Cove Districts of Barbour County, indefinitely described as containing 10,000 to 15,000 acres. By that agreement, Moore undertook to secure options on the coal, for the mutual and equal benefit of himself and Teter. It provided for the payment of a sum equivalent to ten cents per acre and for equality in the burden of expenses and other out-lay in the procurement of the options, as well as in the profits that might accrue therefrom. By an agreement, dated, October 11, 1905, J. M. Guffey took from Moore, an option on about 8,000 acres of coal in Barbour County, and therein accorded to Moore the privilege of increasing the acreage to 11,000. To this agreement, there is appended a schedule or list showing a total of 11,447.178 acres. On this agreement, there is endorsed a memorandum, dated, October 14, 1905, and signed by Teter and Moore, saying: ''The foregoing contract is for the joint benefit of C. F. Teter & S. A. Moore and they are to share equally in profits and losses and to be jointly liable on acct. of the foregoing contract.''

The Moatsville Field, the Teters Creek Field and the Meadowville Field, containing in the aggregate 15,049.38 acres, all lie in Glade and Cove Districts of Barbour County. Two other tracts situate in those districts, the England tract of 138 acres and the Holsberry Tract of 99.4 acres, were conveyed to Guffey by Moore. This makes a total of 15,286.78 acres in Cove and Glade districts, the territory contemplated by the written contract of July 25, 1902. The large Meadowville Field, 7,570.06 acres, constituted the principal subject matter of the contract between Moore and Guffey, dated, October 11, 1905. In his testimony, Moore admits Teter's equal interest with him in the Harris Field, Belington Field No. 1, Belington Field No. 2, the Barker District Field and the Fridley Field. All of these fields lie outside of the two magisterial districts named in the contract of July 25, 1902, and contain over 9,500 acres. He admits Teter's equal interest

in 637 acres of the Moatsville Field, but denies it as to the residue thereof, 3,522 acres. He also denies Teter's interest in the South Philippi Field, 2,625.5 acres of the Teters Creek Field, the England tract of 138 acres and the Holsberry tract of 99.4 acres.

None of these exceptions made by Moore are recognized in the statement prepared by Carter, the bookkeeper, and dated, October 19, 1906. That statement is preceded by a caption or letter designating it as a detailed statement of the financial status of S. A. Moore, Trustee, including the resources and liabilities, together with a complete statement of all moneys expended in carrying on the affairs of the said S. A. Moore, Trustee. It also directs attention to a great reduction, since the last report, in both resources and liabilities, due to the turning over of the different coal fields, to the fact that the "Financial condition of the partnership affairs" had "never been in better shape," and to the profits of Moore and Teter, stated in equal amounts. Though the bookkeeper called the paper a statement detailing the financial status of S A. Moore, Trustee, he, in the same instrument, speaking of the subject matter of the statement, necessarily, says the financial condition of the partnership had never been in better shape. In that statement, he listed all of the resources as being joint property. In that part of it which may be treated as a summary of what had been done by the interested parties, he set forth the total sales and the total expenses, without division or apportionment as to properties and an equal distribution of profits up to that date. This statement must necessarily have been based upon the books and it may well be assumed, although it has been proved by the testimony of witnesses, that the expenses were charged against the entire proceeds of sales.

One copy of this statement, with the introductory letter or caption, was delivered to Moore and another to Teter, and each has been preserved. To the copy produced by Teter, there is appended a statement, saying it represents the joint assets and liabilities of S. A. Moore and C. F. Teter as per settlement, and that all the assets represented therein were for the joint use and benefit of the undersigned. It further

said the parties thereto were equally and jointly responsible on any litigation accruing from the various coal transactions in Barbour County, or elsewhere, whether the same should be against one or both of them, and that it was the intention of the paper to show the settlement of the partnership affairs between the parties thereto up to and including the date written below, October 19, 1906. It purports to be signed by S. A. Moore, and the bookkeeper testifies that, in his opinion, the hand writing of the name is that of Moore. The copy produced by Moore does not have that stipulation attached. As prepared by the bookkeeper, the statement was composed of more than one sheet of paper and the sheets were fastened together with eyelets. Moore swears no such stipulation was ever attached to the copy he had, and he testifies, and produces other witnesses who say, Teter could write his (Moore's), name just as Moore wrote it himself, and often did so. His theory is that Teter wrote this stipulation, signed his, (Moore's), name to it and attached it to the paper. The theory of the plaintiff is that Moore had a like copy signed by Teter and has detached it from the statement. Both papers are typewritten, but they were prepared on different machines and with different ink ribbons. If the stipulation is genuine, it was no doubt prepared after the statement had been made and examined, wherefore the difference in ink and type is not very significant. It is hardly probable that the bookkeeper, in making up the statement, would have prepared and attach to it, a stipulation of that kind. Moore does not expressly or directly deny the signature to the stipulation. He contents himself with proof of circumstances tending to cast suspicion upon its genuineness.

Moore's denial of Teter's equal interest in the profits realized from the 3,522 acres of the Moatsville Field, is based upon certain contracts relating thereto. What the history of this portion of the field was, prior to February 19, 1906, is not deemed important. On that day, the Douglass Rausch Coal Company, grantee of the Moatsville Coal Company, entered into a contract with S. A. Moore, by which it bound itself to sell and convey to him, its coal, in consideration of $94,500.00, of which $1,800.00 was paid in cash and the bal-

ance deferred. Of the latter, a sufficient sum to make a cash payment of $60,000.00, with some additions for interest charges, was to be paid, on approval of the title papers and deed therein provided for, less the cash payment of the $1,-800.00. The grantor agreed to accept $40,000.00 of its own notes executed to another mining company, as cash, and the residue was to be paid on or before six months from the date of the deed. On the same day, an agreement between S. A. Moore, Trustee, S. A. Moore, E. F. Hartley and C. F. Teter, respecting this property, was entered into, in which it was stipulated that Moore was acting as trustee for himself and the other parties, but that the surface land, obtained from the Douglass Rausch Coal Company, was to be conveyed to Hartley; that the sale price of the property as between the parties thereto, was $33.00 per acre; that Hartley was to accept $40,000.00 of the acceptances of Guffey, J. W. Hair and C. B. Reed, at 6, 12 and 15 months, if necessary, in return for the notes of the Douglass Rausch Coal Company; that the proceeds of sale at $33.00 per acre should be distributed, after paying the purchase price in acceptances, cash or evidences of debt, by the trustee, equally among S. A. Moore, C. F. Teter and E. F. Hartley; and that any expense was to be mutually agreed upon and paid equally by all the parties. Moore's interpretation of this contract is, that it gave him all profits to be realized on these lands, above $33.00 per acre. They were sold to Guffey at $40.00 per acre, and conveyed to him, May 25, 1906. This field was within the territory contemplated by the contract of July 25, 1902, and, moreover, a draft given by Guffey for purchase money of this particular field is listed as an asset in the statement of July 23, 1907. Besides, two small parcels of surface land in this field, one containing 26 acres and the other 22 acres, are listed at $250.00, in the resources set forth in the statement of October, 1906, and the one of July 23, 1907. These two tracts were probably not parts of the Douglass Rausch property, else they would have gone to Hartley, but they were in the Teters Creek Field. Moore says he gave Teter a half interest in them for services rendered in 1908 or 1909, but they were listed as joint property, before that date.

Two drafts representing purchase money of the South Philippi Field, one for $5,000.00 and the other for $1,081.35, are listed as joint resources in the settlement of July 23, 1907, and, on the books of the company Moore's profit account is credited with two $5,000,00 drafts for such purchase money and Teter's profit account is likewise credited with two such drafts.

The Teters Creek Field was covered by the contract of July 25, 1902, and also by the memorandum of October 14, 1905, endorsed on the option contract between Moore and Guffey. In handling this property, it became necessary to organize a corporation known as the Teters Creek Coal Company, and put the title in it. Afterwards, it passed to Moore, and he conveyed it to Guffey, who paid part of the purchase money in drafts. In the statement of October 19, 1906, one of these drafts for $5,000.00 is listed as part of the resources. On the books, Teter was credited with $3,870.56, as part of the proceeds of a draft given for purchase money of this field and Moore's account was credited with a like amount from the same source. An incident of the transfer of the title from the Teters Creek Coal Company to Moore, was a suit in equity by one O. H. Suck, charging fraud in the transaction, upon the stockholders of the Teters Creek Coal Company, of whom he was one. Teter had been president of the company and Moore a stockholder. Of the stockholders, there were two classes, one known as promotion stockholders, and the other as stockholders who had paid money for their stock. At a stockholders meeting, a resolution was passed authorizing sale and conveyance of the property to Moore, on the basis of $36.00 per acre, as to the promotion stockholders, and $42.00 per acre as to the others; and, on the same day, an optional contract of sale was made. The theory of the bill filed was, that Teter was to receive additional and secret profits out of the transaction. He filed an answer in the cause, denying the charge and any interest in the resale of the property by Moore to Guffey. How the matter was finally adjusted does not appear here, for the suit was compromised and dismissed.

Tested by principles declared in *Kyle* v. *Griffin,* 76 W. Va. 214, *Krebs* v. *Blankenship,* 73 W. Va. 539, and *McKinley* v.

*Lynch,* 58 W. Va. 44, the agreements of July 25, 1902 and October 14, 1905, obviously established a copartnership relation between Teter and Moore as to the profits to be derived from the coal to which they related. The equality of burden as to expenses and profits signifies intention not merely to purchase coal, but to buy and sell it for profit. Of course, the enterprise incidentally involved the taking of title which, in the event of failure to make sale of the properties, might remain in the parties, or the legal title might remain in the one to whom the conveyances were made, and equitable title in the other. *Floyd* v. *Duffy,* 68 W. Va. 339. Under our decisions, there is no longer doubt that real estate may be a primary subject of a partnership relation. To make it partnership property, it is not essential that it be acquired incidentally in the prosecution of the purposes of a trading or industrial business conducted in a firm name.

A partnership agreement or relation probably could not be inferred from a mere joint purchase, nor from book entries showing a joint interest, with equality in the burden of expenses and losses and in the advantages of gains and profits. Whether it could be established in the manner last mentioned, it is unnecessary to say. The agreements of July 25, 1902 and October 14, 1905, read in the light of the oral testimony and documentary evidence, disclosing the scope and character of the enterprise, the amount of work done and the mode of its accomplishment, go far beyond the conditions and circumstances necessarily disclosed by the book entries. An agreement to get together and consolidate into one body, or into several bodies, small holdings of coal in place, so as to make them marketable, and dispose of the same, and to share the burden and advantages equally must be more than a joint adventure. It does not contemplate a single transaction, but numerous transactions, necessarily extending over a considerable period of time. Though it involves a joint interest and a joint adventure, it is a working contract, in which capital, enterprise and labor are combined for the achievement of profitable results. In this, all of the essential legal elements of a partnership are found, and it does not matter that, in the execution thereof, subsidiary or auxilliary agreements

must be made for inclusion and exclusion of subjects. They are incidents of every partnership, whether formed for the purposes of trade or prosecution of industrial enterprises. The partners must determine what they will buy and sell, and what they will manufacture and dispose of, or what kind of work they will undertake. This feature of an agreement to buy and sell real estate for profit does not deprive it of the elements of a partnership contract. *Kyle* v. *Griffin*, 76 W. Va. 214.

The documentary evidence of the partnership contract does not contemplate that relation as to any subject lying outside of two magisterial districts, but the actual operations conducted by the parties went far beyond them, and the coal purchased outside thereof was handled in the same way as that contemplated by the original agreement. It was consolidated in the same manner, by the same character of hazard, labor and expense, sold to the same party at about the same time and the proceeds included in a statement of resources and liabilities, with a summary of the total amount of business done. For the transaction of all the business, the same offices, office furniture and clerical help were used, and records thereof kept in the same set of books. The defendant admits that nearly 10,000 acres outside of the two districts were handled in this way and that the interests of the parties therein were equal. The written contract of July 25, 1902, is the foundation of a partnership relation. Though its terms do not affirmatively go beyond coal in the two magisterial districts, it does not expressly limit the enterprise to that coal. There is not a word in it, forbidding extension of the enterprise to coal in other localities. No rule of law forbids extension of the enterprise by subsequent oral agreement, nor does the addition thereof alter the terms or the contract, within the meaning of the principle. The rule invoked in argument is not infringed by oral proof of a new and distinct agreement upon a new consideration, whether it is a substitute for the old one or an addition to it. *Jarrett* v. *Nickell*, 9 W. Va. 345; *Shepherd* v. *Wysong*, 3 W. Va. 46; *Conner* v. *Lucus*, 13 Gratt. 705; *State* v. *Harman*, 15 W. Va. 115; *Grant* v. *Rickards*, 2 Gratt. 539. An addition to the

written agreement may be inferred from the bringing in of
new subjects and treatment or disposition thereof on the basis
of the written agreement.   Indeed, no other reasonable con-
clusion or inference is deducible from the facts.

The formal contracts invoked by the defendant, in his effort
to exclude from the partnership enterprise, a large part of
the Moatsville Field and all of the Teters Creek Field, are
not necessarily inconsistent with the trial court's findings.
The contract relating to the former does not, by any ex-
press terms used determine anything between Teter and
Moore, as to any excess of sale price over $33.00 per acre.
They were partners.   Hartley had no connection with the
firm, but he had an interest of some sort in this particular
field, or some hold upon it.   The contract of purchase was
made in the name of Moore, as were all the others.   Mani-
festly, the purpose of the agreement signed by Moore, Teter
and Hartley was the determination of Hartley's interest in
the proceeds of the contemplated sale to Guffey, and that sale
must then have been in reasonable prospect, for the convey-
ance was made about three months afterward.   The coal lay
within the territory of the original partnership agreement
and there is evidence of an equal division of the proceeds of
sale on the books.

The Teters Creek Field was also in that territory, and
there is evidence of an equal division of its proceeds on the
books and of a charge of losses sustained thereon, in the
ledger.   The contract of purchase was made in the name of
Moore, and he took the title temporarily, as in other cases.
It was not held long, for Guffey got it in June, 1906, and the
optional contract of purchase was made in March of that
year.   How long Suck delayed consummation of the trans-
action, does not appear.   Nor is Teter's admission judicially
made in the suit instituted by Suck conclusive.   16 Cyc. 1050,
citing numerous authorities.   It was made for the purposes
of that suit, which was not one involving any controversy be-
tween these parties.   The circumstances and documentary
evidence here disclosed and produced disprove the truth of
the admission made in that suit.

It is not necessary here to inquire and determine whether

every tract conveyed to Guffey by Moore, at or about the date of the conveyances thus far discussed, considered and passed upon, was partnership property. Enough has been determined to show the charges made in the bill, if true, have injuriously and wrongfully affected the plaintiff's decedent and are remediable by the remedy chosen, if not barred by laches or the statute of limitations.

The defense of laches is not well founded. The bill alleges ample reason and excuses for delay, and there is no proof of such loss of books and papers or death of witnesses, as materially interferes with or embarrasses the determination of the issues of fact raised by the pleadings. Practically all of the books, papers and contracts are produced, and it does not appear that any material witness is dead except C. F. Teter, and he brought the suit in his lifetime.

As to any settlement made, the statute of limitations runs from the date thereof and bars any item or matter included therein after five years, whether effected or induced by either fraud or mistake. To reach such a matter either at law or in equity, there must be allegation and proof of facts sufficient in law to bring it within the exception provided by sec. 18, ch. 104 of the Code. *Foster* v. *Rison,* 17 Gratt. 321; *Newberger* v. *Wells,* 51 W. Va. 624; *Thompson* v. *Whitaker Iron Works Co.,* 41 W. Va. 574; *Whitaker* v. *Improvement Co.,* 34 W. Va. 217; *Paxton* v. *Paxton,* 38 W. Va. 616; *Jackson* v. *Hull,* 21 W. Va. 610; *Vanbibber* v. *Bierne,* 6 W. Va. 168. The bill does not, in terms, allege concealment of the alleged frauds, nor obstruction of the right of action by any act done by the defendant after the perpetration of the frauds; but it sets forth facts sufficient to make out a case of concealment and obstruction. It says the defendant was the custodian of all the books, and charges him with having made entries in the books, of large sums of money, as having been paid out for expenses, which were never actually paid, and for payment of which there was no obligation on the part of the firm. It further charges that Teter, relying upon the honesty and integrity of his associate, made no investigation of the books, for verification of the two statements, and did not suspect the existence of the alleged frauds, but that, within

six months of the institution of the suit, he ascertained from the public records and other sources that gigantic frauds had been perpetrated upon him, some of them in the manner aforesaid and some in other ways. A fraudulent entry of the kind described, made by one having authority to pay expenses and charge the same, naturally conceals itself, wherefore allegation and proof thereof makes out a case within the statutory exception. *Newberger* v. *Wells,* 51 W. Va. 624; *Bailey* v. *Glover,* 21 Wall. (U. S.) 346; *Quimby* v. *Blackey,* 63 N. Y. 77; *Way* v. *Cutting,* 20 N. H. 187; *Bank* v. *Harris,* 118 Mass. 147; *Rice* v. *White,* 4 Leigh 474. Recognizing the principle, Judge Brannon said, in *Thompson* v. *Whitaker Iron Works Co.,* 41 W. Va. 574, 585: ''I do not say that where the facts giving cause of action are within the defendant's knowledge exclusively and he is bound to communicate them, and the plaintiff has no notice of anything to suggest or inform him of his rights, such would not be an obstruction under the statute.'' Moore and Teter were partners and Moore the firm's trustee, holding all the funds, clothed with large powers and keeping the books, according to the allegations of the bill. It was his duty as a partner and as a trustee to make full and truthful disclosure of every fact in his knowledge, necessary to a full, fair and honest settlement. The relations were close and strictly confidential. *Kyle* v. *Griffin,* 76 W. Va. 214; *McKinley* v. *Lynch,* 58 W. Va. 44; *Krebs* v. *Blankenship,* 73 W. Va. 539.

Included in the item, ''Commissions Paid, $106,671.12,'' of the statement of October 19, 1906, and entered on the books, are three charges of commissions, as having been paid to J. S. Willard, W. F. Johnson and Willard and Johnson, respectively, the first being $11,199.63, the second $5,552.58 and the third $2,002.32. These men were agents of Guffey, Willard being his office and confidential man. He swears no such sums or any other amounts, were ever paid to him or to him and Johnson. Another agent, J. W. Hair, was authorized by Guffey to take commissions on coal purchased through him and some of his commissions were retained for him by Guffey in the settlements. According to Willard, those so retained amounted to $14,145.48. Moore does not claim the three sums

in question were actually paid to the parties named on the books as having received them. His answer avers they were paid to Hair for Willard and Johnson, but there is no proof of the averment, by the testimony of Hair, by any receipt or check, or otherwise. Three witnesses, C. E. Robinson, stenographer for Moore and Teter, R. F. Holden, an accountant employed at one time to audit the accounts, and John R. James of Pittsburg, Pa., swear the entries were brought to Teter's attention and that he expressed satisfaction therewith. Two witnesses, the plaintiff and his attorney, swear Robinson told them, at Cincinnati, O., sometime before he testified, that he had never heard the Willard and Johnson commissions mentioned by Moore and Teter in any conversation. Holden says he discussed the matter with both Moore and Teter; that Moore suggested the opening of an account with Hair; and that Teter objected, saying he cared nothing about who got the commissions and that, if Moore got any, he was glad of it, as the parties purporting to have received them were rogues and Moore had done all the work. He says this occurred in the latter part of 1908 or 1909. He made no audit, because Teter stopped him, on account of the expense, $10.00 a day and expenses for three weeks or a month, saying he had gone over the books himself and was satisfied. James testifies that he heard a conversation between Moore and Teter in Pittsburg, in which Teter told Moore, in view of a suspicion that Hair was not paying over to Willard and Johnson the commissions paid him for them, to discontinue the payments for them and keep them himself.

Moore's answer not only renders this testimony inadmissible, but also deprives it of any probative force in so far as it purports to say Moore had right to retain the commissions. The answer avers the payment of all this money to Hair and the respondent's ignorance of the course of the transaction between Hair and Willard and Johnson, and as to what settlement was made between them, if any. It amounts to a clear and distinct admission, in a sworn answer, that the respondent did not retain the commissions in question, as having been allowed or given to him by Teter for extra services or other consideration. It is a judicial admission made

in this cause and between these parties, wherefore it is conclusive in all of its tendencies, bearings and aspects. "Admissions in the pleadings cannot be either proved or disproved on the trial, but must be accepted for whatever they amount to in legal effect, without reference to any other evidence that may be adduced." *Plank Road Co.* v. *Stallcup,* 62 Ind. 345; *Bartrand* v. *Taylor,* 32 Ark. 470; *Weeder* v. *Clark,* 27 Ill. 251; *Raridon* v. *Railroad Co.,* 69 Ia. 527; *Morrison* v. *Riker,* 26 Mich. 385; *Miller* v. *Moore,* 1 E. D. Smith (N. Y.) 729; *Smith* v. *Ninocks,* 94 N. C. 243; *Hughes* v. *Prewitt,* 5 Tex. 264; 16 Cyc. 1048.

Teter's knowledge of the entries in the names of Willard and Johnson gave no notice of any fact sufficient to put him upon inquiry. These funds were in Moore's hands, as well as practically all others, and he made practically all of the disbursements for expenses, as well as contracts entailing expenses. Seeing these entries, if he saw them, Teter had right to assume their genuineness and rely upon it, in the absence of knowledge of any fact tending to prove lack of a basis therefor. His examination of the books would not disclose non-payment of these large sums of money. On the contrary, the entries represented that they had been paid and, therefore, they obscured and concealed the true situation and misled him. They told him in plain terms over $18,000.00 had gone to these men, when, in point of fact, Moore had paid them nothing. This amounted to a retention of them by means of a false entry in the books.

The answer denies that the defendant kept all the books and there is evidence tending to prove Teter had access to them and directed entries to be made therein. During part of the period in which their enterprise was actively prosecuted, Moore seems to have done the bookkeeping, but, later, W. H. Carter was employed to keep them. The office rooms were three in number, Teter occupying one, Moore another and the bookkeeper and stenographers the third or middle room. It may well be assumed that Carter made entries at the instance and upon the direction of each, but this does not prove notice to Teter, of the lack of foundation for the entries in question. As Moore was paying the commissions, directions

for entries respecting them logically came from him, and he could have fraudulently given them, without the knowledge of either Teter or the bookkeeper.

The trial court found fraud on the part of Moore, respecting a credit of $5,000.00 to himself, on the books, for extra services rendered or work done, in the consolidation and sale of one of the coal fields. The answer avers, and Carter testifies, it was the Meadowville Field. Witness Robinson says it was the Teters Creek Field. As this item appeared on the books and Teter had access to them and at least two witnesses say he frequently examined them, and another, that he declared he had examined them, the proof does not make out a case of obstruction to right of action, within the meaning of sec. 18, ch. 104, Code. If the entry was fraudulent at all, it was not of such character as to work any concealment. Moreover, diligence on the part of Teter would have disclosed it. Deeming Moore not entitled to this sum, for lack of a special contract for extra services, the court below seems to have regarded his lack of right to the credit and the unauthorized entry, sufficient to establish fraud. The authorities do not sustain this conclusion.

The establishment of fraud in the charges made on the books and carried into the settlements, as for money paid on account of commissions, vitiates the entire settlement and calls for a restatement of the account *in toto,* and, upon this theory, the trial court properly referred the cause to a commissioner for that purpose. *Daniel* v. *Gillespie,* 65 W. Va. 366; *Allfrey* v. *Allfrey,* 1 Mac. & G. 87; *Williamson* v. *Barbour,* 9 Chy. Div. 529; *Gething* v. *Keoghley,* 9 Chy. Div. 547; Lindley, Part. 969; Col. Part. sec. 298. Failure of one of the grounds upon which the decree is based, does not necessitate reversal, one instance of fraud being as efficacious as two or more. In addition to the two items here considered, numerous others are attacked by the bill, but the trial court made no finding as to them.

Carter was introduced as a witness for the plaintiff, but was not interrogated by him, as to his authority for making the $5,000.00 entry, just mentioned. On cross-examination, he testified that he had made it by direction of both Teter

and Moore. Objection was made to the tesimony of two other witnesses, subsequently introduced, who said he had told them he had never heard either Teter or Moore mention the matter. As to this matter, he was the defendant's witness. *Lambert* v. *Armentrout,* 65 W. Va. 375; *McGuire* v. *Railway Co.,* 70 W. Va. 539. Nevertheless, the party introducing a witness cannot consistently be permitted to impeach his character for truth and veracity. As to this proposition the authorities seem to be in practical unanimity. 7 Ency. Ev. 39. Many of them go to the unreasonable extent of holding a witness, testifying on cross-examination as to matter not touched in his examination in chief, cannot be impeached by the party who introduced him, by proof of a variant statement. *White* v. *State,* 87 Ala. 24; *Smith* v. *Provident Sav. L. Assur. Soc.,* 13 C. C. A. 284. As this involves no attack upon the character of the witness and goes to his recollection and the mere truth of his statement, it should be permitted and so other authorities hold. *Brewing Co.* v. *Ruddy,* 67 N. E. 1124; *Jones* v. *People,* 2 Colo. 351.

There was technical error in the rejection of the special pleas based on the statute of limitations, but, as the same defense was set up generally in the answer, the error is harmless and does not necessitate reversal of the last decree entered, settling the principles of the cause.

The trial court erred in sustaining an exception to a portion of Moore's answer, setting up a right of contribution from the firm for one-half of large amounts paid by him, in discharge of his liability as a joint endorser with Teter, of Guffey notes and drafts taken as part consideration for coal conveyed to him, and striking it out. The right of a partner to resort to the firm for contribution for discharge of its debts, or for enforced discharge of its obligations, is not a debatable question. *Koelz* v. *Brinkman,* 50 W. Va. 270, 279; *Morris* v. *Morris,* 4 Gratt. 293; Bates, Part. sec. 759; Collyer, Part. p. 491, sec. 325. If the averments of the answer are true, the partners have right of recourse upon the firm. It is assignor and they are its assignees, and an assignor guarantees that the assignee shall receive the full amount of the bond or note assigned, if he fails to collect the same by the

exercise of due diligence. *Thomas* v. *Linn,* 40 W. Va. 122; *Jenkins* v. *Hawkins,* 34 W. Va. 799; *Peay* v. *Morrison,* 10 Gratt. 149; *Mackie* v. *Davis,* 2 Wash. (Va.) 281. Application of these principles, under the circumstances, will result in a charge against any amount due from Moore to Teter's estate, of one-half of any sum Moore has been compelled to pay by reason of such endorsements, and a decree for payment out of such sum to the parties entitled thereto, of one-half of any outstanding obligations on which there is joint liability by reason of such endorsements.

There is a suggestion of justification of the action of the court, in the elimination of this part of the answer, on the ground of Moore's assertion of the demand set up in it, in another suit pending for settlement of Teter's' estate. Being a partnership liability constituting a factor or element in the partnership settlement, it cannot be excluded from this suit on that ground.

As this error pertains to the basis of the accounting and not the right to an accounting declared by the decree of Jan'y. 23, 1915, it does not call for reversal of that decree.

For the reasons stated, the decree of May 2, 1913, will be reversed and set aside in so far as it rejected special pleas Nos.: 4, 5, 6, 7, 8, 9, 10, 11 and 12, and struck out that portion of Moore's answer, which asserts firm liability to him, on account of payment of obligations jointly endorsed by him and Teter, and the decree of January 23, 1915, will be affirmed and the cause remanded.

*Reversed in part. Affirmed in part. Remanded.*